680 So.2d 1296 (1996)
STATE of Louisiana, Appellee,
v.
Marvin DAVIS, Appellant.
No. 28662-KA.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1996.
*1297 Steven R. Thomas, Mansfield, for Appellant.
Richard P. Ieyoub, Attorney General, Don M. Burkett, District Attorney, Richard Z. Johnson, Jr., Assistant District Attorney, for Appellee.
Before MARVIN, WILLIAMS and GASKINS, JJ.
WILLIAMS, Judge.
The defendant, Marvin Davis, was indicted by a DeSoto Parish grand jury for manslaughter, a violation LSA-R.S. 14:31. After a jury trial, he was convicted as charged. The trial court sentenced defendant to serve ten years imprisonment at hard labor with credit for time served. The trial court denied *1298 a timely motion to reconsider sentence. Defendant appeals his conviction and sentence, challenging the sufficiency of the evidence used to convict him of manslaughter and the excessiveness of the sentence imposed. For the reasons assigned below, we affirm the defendant's conviction and sentence.

FACTS
On the evening of Friday, November 4, 1994, the victim, Dwight Youngblood, and three friends attended a football game in Springhill, Louisiana. On the way to the game, the group purchased and shared a case of beer. After the game, the four young men returned home to Mansfield, Louisiana and drove past a disco where a young lady stopped them and asked for a ride to a nightclub commonly called Sacky Joy's. When they arrived at the nightclub, Youngblood escorted the young lady into the club, while the other young men remained in the car.
On the same evening, the defendant arrived at Sacky Joy's to give his mother, who was working at the club, some money he owed her. He remained at the club to socialize. The defendant's left arm was in a sling because of an on-the-job injury he had sustained when he fell down a flight of stairs.
The defendant testified on his own behalf at trial. According to the defendant, he first saw Youngblood around midnight, after leaving the club and going around the corner of the building. Defendant claims Youngblood hit him. He staggered back and told Youngblood not to hit him again. Youngblood allegedly called defendant a bad name, reached toward his back pocket, hit the defendant again, and began talking about a woman named Debbie or Deborah. Defendant stated that Youngblood's second blow was so forceful that he believed Youngblood had hit him with brass knuckles. Defendant claims he started to run backwards with his arm still in the sling. He claims he took out his knife because he was afraid for his life, since Youngblood continued to approach him. Eventually, defendant managed to open his knife with one hand, cutting himself in the process. Although defendant was swinging his knife to keep Youngblood away from him, Youngblood allegedly kept coming toward the defendant. When further describing the altercation, defendant stated that he and Youngblood were grappling and fighting. Defendant also admitted that his arm came out of its sling during the confrontation. Defendant claimed that Youngblood finally slowed his approach and at about the same time, the knife fell from defendant's hand and he ran away. According to the defendant, he does not know at what time during the altercation Youngblood was stabbed.
Jeanetta Carhee, defendant's girlfriend at the time of this incident, told a different story. At trial, she stated that she and defendant left the club to get some fresh air, when Youngblood grabbed her by the arm and asked her about her daughter. According to Carhee, the defendant saw Youngblood touching her and pushed Youngblood away. Youngblood then hit the defendant. Defendant pulled out his knife and grabbed Youngblood with the hand of his injured arm. Carhee testified that because she then ran to the front of the club to get help, she did not see the actual stabbing. During the trial, it was revealed that Carhee gave several statements throughout the investigation of this incident. In one of her previous statements, she claimed responsibility for the stabbing. In another statement, she claimed that Youngblood was the aggressor in the altercation, and that Youngblood and the defendant were discussing someone named Debbie.
Martha Howard, another eyewitness and an employee at Sacky Joy's, testified that the defendant passed her and another person with whom she was having a conversation as the defendant left through the rear door of Sacky Joy's. She stated that defendant went around the side of the club and when she next saw him, he was walking backwards. She stated she saw another man coming toward defendant who she did not know at the time of the incident, but who she knew at the time of trial to be the victim, Youngblood. Howard stated that she saw Youngblood hit the defendant twice in the face as the defendant stumbled backward and held his arm upward to ward off another blow. According to Howard, she ran into the club to get *1299 defendant's sister and did not see the actual stabbing.
The jury was also presented with conflicting testimony regarding the actual stabbing. Jaretta Lloyd, one of the state's eyewitnesses, testified that when she came out of Sacky Joy's, she saw Youngblood and the defendant fighting. She stated that Youngblood's shirt was over his head, his head was in the defendant's chest, and he was holding on to defendant's shoulder. Youngblood was not fighting, but defendant was hitting Youngblood in the back with both hands. Lloyd stated that she never saw Youngblood hit the defendant. She testified that after two or three minutes, defendant moved Youngblood to the ground, straddled him, and stabbed him.
Another state witness, Wilfred Woods, stated that on the night of the incident, he and his girlfriend, Jaretta Lloyd, came out of the club and saw two men struggling. Woods recognized the defendant. According to Woods, in the beginning, the defendant was using one hand to fight. However, defendant's other arm later came out of the sling, and defendant started winning the fight. Youngblood fell to the ground twice. When the victim fell the second time, Woods saw the defendant bend down, pull Youngblood's shirt over his head, and hit Youngblood in the chest. The defendant's sister then grabbed the defendant and led him away from victim. At that time, Woods saw defendant with a bloody knife. Woods also testified that when the defendant stabbed Youngblood, the knife entered Youngblood's body in an upward direction.
After the altercation, defendant initially went into the club and eventually to his aunt's house nearby. Lloyd testified that the defendant entered the club with the knife in his hand. However, the knife was never recovered. Defendant cleaned himself at his aunt's house, waited for all of the people to leave the club, including the law enforcement officers, and then went to the DeSoto Parish Jail. At the jail, defendant gave the officers a statement regarding the events of the evening that was consistent with his testimony at the trial.
Detective Robert Davidson of the DeSoto Parish Sheriff's office, testified regarding the defendant's physical appearance at the jail. He stated that the defendant's arm was in a sling, and the only evidence that defendant had been involved in an altercation was a small knot above his left eye and a cut on the index finger of his right hand. Detective Davidson testified that defendant's clothes and the sling were clean, but that he had a drop of blood on one of his shoes. Detective Davidson believed that the defendant had been drinking. Officer John Cobb of the Mansfield Police Department testified that he smelled alcohol on the defendant's breath. However, the defendant was not administered a blood alcohol test.
Dr. Brenda K. Reames, the Chief Deputy Coroner for Caddo Parish and Deputy Coroner for Bossier Parish, performed an autopsy on Youngblood. She performed a blood test that indicated that Youngblood had a blood alcohol content of .16. She noted that Youngblood had a total of six incised (slash) wounds on the left side of his body and one stab wound in his chest. She testified that the imprint from the hilt of the knife could be seen on Youngblood's chest. Dr. Reames opined that Youngblood died of the stab wound to the chest. Dr. Reames also testified that the incised wounds were possibly defensive wounds, sustained when the victim used his body parts to deflect injury. Dr. Reames stated that Youngblood had no bruises or abrasions on his hand that would be consistent with him having been involved in a fight. However, she testified that although such bruises and abrasions are commonly found on persons she examines who were in fights prior to their deaths, they do not always appear. When asked the path of the stab wound, Dr. Reames stated that the wound path was downward. Finally, Dr. Reames opined that a knife caused all of the wounds on Youngblood's body.
Several other witnesses who saw or spoke with Youngblood on the night of the incident testified during the trial. None of these witnesses saw Youngblood with a weapon at anytime during that evening. According to Detective Davidson, police did not recover a weapon from Youngblood's body.

*1300 DISCUSSION
On appeal, the defendant relies on three assignments of error. The defendant contends that the state did not prove beyond a reasonable doubt that he was guilty of manslaughter. He also contends that the sentence imposed is excessive and outside the sentencing guidelines. After a review of this record, we find that these assignments lack merit.

SUFFICIENCY OF THE EVIDENCE
The criteria for evaluating sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all elements of the crime proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard, now legislatively embodied within LSA-C.Cr.P. Art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Combs, 600 So.2d 751 (La.App. 2d Cir.1992), writ denied, 604 So.2d 973 (La.1992). All evidence, both circumstantial and direct, must be sufficient under Jackson to satisfy a rational juror the defendant is guilty beyond a reasonable doubt.
Manslaughter is a homicide that would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. LSA-R.S. 14:31; State v. Williams, 26,716 (La.App. 2d Cir. 5/10/95), 658 So.2d 703.
A homicide is justifiable as self-defense only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. LSA-R.S. 14:20; State v. Cotton, 25,490 (La.App. 2d Cir. 3/30/94), 634 So.2d 937; State v. Jones, 600 So.2d 875 (La.App. 1st Cir.1992); State v. Carroll, 542 So.2d 762 (La.App. 4th Cir.1989), writ denied, 550 So.2d 625 (La.1989).
A defendant asserting self-defense does not assume any burden of proof on that issue. The state has the affirmative duty of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense. State v. Cotton, supra; State v. Harris, 26411 (La.App. 2d Cir. 10/26/94), 645 So.2d 224. The relevant inquiry on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self defense. The appellate court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Cotton, supra; State v. Harris, supra.
In the instant case, every witness who saw a portion of the fight testified that they did not see the victim with a weapon. The defendant could not say with certainty that the victim had a weapon. He based his belief that the victim was using brass knuckles on the fact that the alleged second blow by the victim was much harder than the first.
The testimony of Dr. Reames, the state's expert witness in forensic pathology, supports the theory that defendant was not acting in self-defense. She stated that an incised (slash) wound on the victim's arm was consistent with a defensive wound and with a wound sustained by someone turning to flee. The doctor also testified that an incised wound on the victim's back was consistent with a person turning to flee. These wounds do not indicate that the victim was fighting the defendant in such a manner that the defendant would reasonably fear for his life. Further, the victim did not have any bruises or abrasions on his hands or knuckles that would indicate that he had been in a fist fight. According to Dr. Reames, although it is possible to be involved in a fight and not have injuries on the hands, it does not happen often. Therefore, it is unreasonable to conclude that the defendant was struck with enough force to cause him to fear for his life.
The defendant makes several arguments in support of his contention of self-defense. Defendant asserts that because the victim was legally intoxicated, was in a rage about someone named Debbie and attacked him furiously, his use of a knife was clearly self-defense. Defendant further argues that because he saw the victim reach toward his *1301 back pocket and because defendant was fighting with one arm, his use of the knife was clearly self-defense. However, Jeanetta Carhee testified that she was with defendant at the beginning of the altercation, and no person named Debbie was ever mentioned. Further, Carhee testified that defendant was the aggressor in the altercation. None of the witnesses to the fight saw the victim reach for his back pocket, and indeed, according to the testimony at trial, the victim neither had a weapon nor lead the defendant to believe he had a weapon. Finally, witnesses for the state testified that they saw defendant using both of his hands during the altercation, even though one arm was injured and in a sling.
Apparently, the jury chose to believe the testimony of the state's witnesses and to disbelieve the testimony of the defendant and his witnesses. Based on the above testimony, any rational trier of fact could have found beyond a reasonable doubt that this homicide was not committed in self-defense. Thus, the record clearly demonstrates that the state carried its burden of proving beyond a reasonable doubt that the defendant was guilty of the offense of manslaughter and that the homicide was not committed in self defense. This assignment of error is without merit.

EXCESSIVE SENTENCE
The defendant also challenges the sentence imposed as excessive and in violation of the sentencing guidelines.[1] Whether a sentence is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates LSA-Const. Art. 1, § 20 (1974) if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in the light of harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Richardson, 545 So.2d 714 (La.App. 2d Cir.1989). A trial court has wide discretion to sentence within the statutory limits. Absent a showing of a manifest abuse of discretion, this court will not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Madison, 535 So.2d 1024 (La.App. 2d Cir.1988); State v. Thompson, 25,583 (La.App. 2d Cir. 1/19/94), 631 So.2d 555.
In the present case, the maximum sentence that could have been imposed is forty years at hard labor. LSA-R.S. 14:31(B). In determining defendant's sentence, the record shows that the trial court considered the defendant's background, including the fact that defendant did not have a prior criminal record, and the circumstances surrounding the offense. After weighing the factors considered, the trial court imposed a sentence of one-fourth of the statutory maximum for the offense of conviction.
As required by LSA-C.Cr.P. Art. 894.1(C), the trial judge adequately stated for the record his reasons for the imposition of the sentence. Considering the facts of this case, most notably that the victim was unarmed, and considering the nature of the crime and the fact that a life was violently taken, we cannot say that a sentence of ten years at hard labor is grossly out of proportion to the seriousness of the offense or that it shocks the sense of justice. The sentence is not constitutionally excessive. Therefore, we conclude that the trial court did not abuse its discretion in sentencing this defendant.
We have examined the record for error patent and found none.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The Louisiana Sentencing Guidelines were repealed by Acts 1995, No. 942, effective August 15, 1995, and are not applicable to this case. Therefore, our review is limited to a determination of whether the sentence is constitutionally excessive, and we decline to address defendant's arguments relating to the sentencing guidelines.