736 So.2d 956 (1999)
STATE of Louisiana, Appellee,
v.
Michael T. RICE, Appellant.
No. 31,871-KA.
Court of Appeal of Louisiana, Second Circuit.
March 31, 1999.
*958 Louisiana Appellate Project By Amy C. Ellender, Mer Rouge, Jimmy C. Teat, Jonesboro, Counsel for Appellant.
Richard Ieyoub, Attorney General, Terry R. Reeves, District Attorney, James E. Lewis, Assistant District Attorney, Counsel for Appellee.
Before BROWN, STEWART and DREW, JJ.
DREW, J.
Michael Rice appeals his convictions and sentence and urges four assignments of error. After a jury trial, the defendant *959 was convicted of aggravated escape (La. R.S. 14:110) and first degree robbery (La. R.S. 14:64.1). The defendant was adjudicated a third-felony offender pursuant to La. R.S. 15:529.1. The trial court sentenced the defendant to life imprisonment without the benefit of parole, probation, or suspension of sentence. Rice contends that there was insufficient evidence to support the convictions, that a mistrial should have been granted because the prosecutor referred to other crimes in argument, that the habitual offender adjudication was illegal and that the sentence was improper and excessive. Finding no merit in any of the assignments, we affirm the convictions and sentence.

FACTS
The defendant was originally charged by bill of information with armed robbery (La. R.S. 14:64), aggravated battery (La. R.S. 14:34) and aggravated escape. At trial, the charges presented to the jury were armed robbery and aggravated escape. The jury convicted the defendant as charged on the aggravated escape and on the responsive charge of first degree robbery.
On the morning of September 26, 1997, James E. Bearden, age 70, was the jailer on duty at the Winn Parish jail. At trial, Bearden explained his regular routine for performing his morning duties. After turning on the telephone in the cell block, he takes the inmates their medications by way of a "catwalk," a hallway around the outside of the cells. The inmates receive their medications through the bars and no door is opened. Usually, with the assistance of a trustee, Bearden then opens the cell block doors in order to remove the mop buckets and replenish the inmates' ice.
Bearden identified S-1, a representation of the Winn Parish jail layout, and testified that it was "pretty close to completely accurate." Bearden testified that the defendant was housed in the third cell of cell block three which is divided into a day room and three individual cells with four beds each. A door opening out into the hallway led into the day room which is accessible to all three individual four-bed cells in the cell block. The cell block was not full on the day of the incident.
On the morning of the incident, Bearden first noticed the defendant "apparently" asleep in his bunk. After giving medicine to Pernell Evans, who was in cell block three, and Charles O'Neal, who was in the corridor, Bearden opened the only door from the corridor into cell block three. From the door, Bearden could only see into the day room where he always looks to see if anyone is standing there. Bearden did not remember how many inmates were in the day room, although the report he made on the day of the incident stated that there were three or four.
O'Neal who was assisting Bearden, then went from the corridor through the door into the day room to retrieve the mop bucket. Although the inmates normally place the mop buckets against the corridor door when they are finished, this was not the case that morning. At that time, "something or somebody" hit Bearden and "slammed" him into the wall or door. Bearden cried out for assistance, but no one was there. Bearden does not remember who "shoved" him into the door, but does remember the defendant "jerking" his mace and Jermaine Johnson holding him. Later, Bearden testified that Johnson knocked him into the door. Bearden testified that the defendant was standing in front of him when he grabbed his mace. He further remembered that the defendant sprayed him with the mace and took his keys and billfold which contained approximately $65. Bearden does not remember who took his radio. He testified that the defendant and Johnson were together at this time. Bearden was temporarily blinded by the mace and then "passed out." The next thing Bearden remembered was trying to reach the office door. Bearden does not remember how he got to the jailer's quarters after the incident, *960 but knows he could not have opened the door because he did not have any keys. Bearden testified that there were no other cell block doors open at the time of the incident.
Bearden suffered a gash in the top of his head as a result of the incident. Before he was taken to the hospital, Bearden was told that the defendant and Johnson had escaped. According to Bearden, he was "groggy" and had an "awful" headache when he made his report on the morning of the incident and could not remember who had done what to him. He was able to remember some things about the incident later that day and the next day. Officer Stanley Martin returned Bearden's billfold and money to him. The billfold was admitted into evidence. Based on the serial number and the sheriff's tag, Bearden identified the radio marked S-3 as the one assigned to the jail and taken from him during the incident.
Incarcerated on the morning of the incident, Charles O'Neal helped Bearden by retrieving the mop buckets and replenishing the ice for the inmates. When O'Neal reached cell block three, Bearden opened the door for him. O'Neal stated that the mop bucket which is usually at the door was in the "bull pen" near the bars to the cells. O'Neal walked into the cell block to retrieve the mop bucket. As he bent over to pick it up, he heard Bearden "holler." O'Neal turned around and saw that the defendant and Johnson had Bearden against the door. O'Neal then saw Bearden on the ground. O'Neal testified that the defendant and Johnson were "snatching" at Bearden's belt and "stuff," and that the defendant took the can of mace and the radio. While O'Neal did not see the defendant spray the mace, he did smell it. O'Neal testified that the incident occurred inside the door of the cell block. When O'Neal reached the site of the disturbance, he was pushed into the bars. O'Neal reported approximately eight to ten inmates were housed in cell block three at the time, but he did not see anyone else in the bull pen or anyone come out while the incident was taking place. On rebuttal, O'Neal testified that he stayed with Bearden until someone, possibly Terry Weatherford, took Bearden downstairs. O'Neal did not see Vernell Jones come near Bearden or attempt to help him.
On rebuttal, Terry Weatherford, an inmate and jail cook, testified that he was sitting at the table outside the kitchen when he heard a commotion. Weatherford heard "something" hit against the wall and Bearden "hollering" for help. Weatherford, who smelled mace, "took off" to the elevator and went downstairs. When Chad Rice brought Bearden downstairs, Weatherford took him to the bathroom, cleaned off the blood and washed out his eyes and face. Weatherford described Bearden's eyes as red and "watering kind of like mattered up and all."
James Smith, the chief civil deputy, maintains inventory control and assigns the sheriffs office equipment. Smith identified S-3 as the portable radio assigned to the jail by inventory control number 850. He testified that the department paid $887.00 for the portable radio on August 5, 1994.
Deputy Jamey Maxwell received a call that there had been an escape from the jail. He performed a "bed check" and discovered that the defendant and Jermaine Johnson were missing. Maxwell also took part in the search for the defendant and Johnson. After receiving information that the stolen radio was located behind the Frazier Machine Shop and the Radio Shack, he found the radio and returned it to the sheriff's office. Maxwell has no personal knowledge regarding how the radio got to that location.
The duties of Chief Deputy Gregg Davies at the Winn Parish Sheriffs Office include the supervision of the jail. The defendant was incarcerated on September 26, 1997, awaiting sentencing. Davies testified that the defendant and Jermaine Johnson were under a legal order requiring *961 their confinement when they escaped. When Davies learned of the escape, he notified all personnel that an escape involving violence had occurred. His bulletin was that the escapees should be considered dangerous, since Bearden had already been injured. Davies was present when the defendant and Johnson were captured the next day in a residence in Dodson, Louisiana. Davies did not give the defendant and Johnson permission to leave the jail, nor did anyone else on duty that morning.
Charles Stanley Martin of the Winn Parish Sheriff's Office was present when the defendant and Jermaine Johnson were captured. Martin assisted in gathering evidence from the escapees and at the home where the two were apprehended. He placed the money that he found in an envelope with the clothing and then placed the envelope in a black plastic bag. He returned the billfold and the money to Bearden. Martin knew that a certain sum of cash had been taken from Bearden, but not the serial numbers of the bills. Martin testified that some of the money recovered may not have belonged to Bearden.
Testifying in his own defense, Michael Rice stated he was currently incarcerated for armed robbery, escape, and other crimes, including armed robbery, to which he pleaded guilty because he was in fact guilty. Admitting he was guilty of the escape, the defendant denied attacking or touching Bearden, grabbing or taking anything from his person or spraying him with mace. Defendant stated that Jermaine Johnson attacked Bearden. The defendant's account was he was in cell two when Johnson attacked Bearden. The defendant testified that he then ran past both Johnson and Bearden closely enough for Bearden to have seen him. The defendant declared that the cook who was in the kitchen saw him, went into the jury room and closed the door. The defendant's version was that he walked up and down the hallway until Johnson came with the "keys, walkie-talkie, and the rest of the other stuff." The defendant stated he did not remember any can of mace. According to the defendant, Bearden walked towards them and picked up the keys. Johnson told Bearden to open the door and Bearden complied. The defendant explained that when Bearden got the key, Johnson put the key into the door and took Bearden "from around this corner by the kitchen and ran back around and opened the door."
On cross examination, the defendant admitted that he had been convicted of simple robbery and armed robbery. The defendant testified that he and Johnson had been convicted for the armed robbery of Lester's Grocery. The defendant denied pleading guilty to the armed robbery because he got a plea agreement. The defendant explained that his simple robbery conviction was for taking tennis shoes from a man whom he had fought.
Jermaine Johnson elected not to testify by invoking his Fifth Amendment right against self-incrimination although subpoenaed by the defense.
Vernell Jones testified that he was housed in cell three with the defendant and Jermaine Johnson. Jones did not see the incident, but did hear something. Jones testified that he looked out of the middle cell and saw the jailer lying on the floor with the door open. Jones then walked out of his cell and "picked Mr. Bearden up." Jones "thinks" that Bearden had a cut on his head. According to Jones, Bearden then staggered down the hall toward the office. Jones testified that he smelled nothing unusual, including mace, where Bearden was.
Another inmate, Quentin Delain Ingram, testified that on the morning in question, he was watching television in cell block three in the T.V. room. Stating he did not see the incident, Ingram testified that after the incident was over, he stepped over Bearden and returned to his cell. He neither saw anyone else nor smelled mace in that area.

*962 DISCUSSION

Assignment of error #2. The evidence presented was insufficient to support the verdict.

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence, because acquittal on that assignment makes it unnecessary to review the other assignments of error. State v. Hearold, 603 So.2d 731 (La.1992);
A defendant "may move for a post verdict judgment of acquittal following the verdict." La.C.Cr.P. art. 821. Although the record does not indicate that the defendant made such a motion, defendant raised evidentiary sufficiency on appeal. Therefore, appellate review is mandated. La.C.Cr.P. art. 920; State v. Green, 28,994 (La.App.2d Cir.2/26/97), 691 So.2d 1273, J. Hightower concurring.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Hearold, supra. The Jackson standard of review is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by the evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Lott, 535 So.2d 963 (La.App. 2d Cir.1988).
The court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, S 5(C); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosely, supra.
Admitting his guilt to simple escape, the defendant contends that the state failed to prove beyond a reasonable doubt that he was guilty of aggravated escape, since he neither attacked Bearden nor sprayed him with the mace. The defendant argues endangerment of human life was not proven. The defendant also contends that the state failed to prove beyond a reasonable doubt that he was guilty of first degree robbery, since he denied taking anything from Bearden. Thus, the defendant argues that the taking of something of value was not proven.
Aggravated escape is defined in La. R.S. 14:110(C)(1), as "the intentional departure of a person ... from any place where such person is legally confined when his departure is under circumstances wherein human life is endangered." To prove that human life is endangered, the state need not prove that the offender is armed. State v. McManus, 94 0974 (La. App. 1st Cir. 6/23/95), 658 So.2d 811; State v. Desselle, 614 So.2d 276, 279 (La.App. 3d Cir.1993).
First degree robbery is defined in La. R.S. 14:64.1, as "the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon."
All persons concerned in the commission of a crime, whether present or absent, and *963 whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime are principals. La. R.S. 14:24.
The only disputed element for aggravated escape, the endangerment of human life, was established by the testimony of Bearden, O'Neal and Weatherford, which conflicted with defendant's account. Bearden testified that he was "slammed" into the wall or door and received a gash to his head which required medical attention. Bearden further testified that the defendant sprayed him with mace while Johnson held him. He was blinded by the mace and "passed out." O'Neal testified that the defendant and Johnson had Bearden against the bars. Although O'Neal did not see the defendant spray the mace, he stated that he saw the defendant take the mace from Bearden, that he smelled mace at the time and that he saw Bearden on the floor. Weatherford described cleaning blood off Bearden and Bearden's watering eyes. Weatherford also testified that he smelled mace.
The jury obviously rejected the defendant's account of the incident. The court will not disturb the credibility call made by the jury. State v. Mussall, 523 So.2d 1305 (La.1988); State v. Ford, 28,724 (La. App.2d Cir.10/30/96), 682 So.2d 847, 850. Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found that human life was endangered based on the testimony of Bearden, O'Neal and Weatherford. Thus, the evidence was sufficient, under Jackson v. Virginia, supra, to convict the defendant of aggravated escape.
Denying he took anything from Bearden, the defendant argues that the state failed to prove that he took anything of value, an essential element of first degree robbery. Bearden testified that the defendant took his mace, keys and billfold. Even though he did not recall whether the defendant or Johnson took his radio, Bearden remembered that the two were acting together at this time. Charles O'Neal testified that the defendant and Johnson were "snatching stuff off" of Bearden and that the defendant "got" the can of mace and the radio.
The jury obviously did not believe the defendant's testimony. As discussed above, the court will not disturb the credibility call made by the jury. State v. Mussall, supra; State v. Ford, supra. Viewing the evidence in the light most favorable to the prosecution, a rational juror could have found that the defendant took something of value from Bearden based on the testimony of Bearden and O'Neal. Thus, the evidence was sufficient under Jackson v. Virginia, supra, to convict him of first degree robbery. This assignment is without merit.

Assignment of error # 1. The trial court erred in failing to grant a mistrial when the prosecution referred to other crimes evidence.

The reference to other crimes occurred in the state's opening statement, when the prosecutor stated:
With regard to the aggravated escape, we're going to show to you that he had been convicted of a previous armed robbery, had been ordered to the Winn Parish Jail by Judge Allen to await sentencing. The sentencing was going to take place, I believe, on September 30 and so he was legally in custody.
In the defendant's view, the state does not have to specifically refer to the underlying conviction in order to prove that the defendant was lawfully detained. Because the state never introduced evidence of defendant's armed robbery conviction during its case in chief, the reference to his armed robbery conviction was unnecessary and highly prejudicial. The defendant also complains that he was not given notice of the state's intent to use his armed robbery conviction as required. This assignment of error is without merit.
The offense of aggravated escape is defined in La. R.S. 14:110(C)(1), as "the intentional *964 departure of a person ... from any place where such person is legally confined when his departure is under circumstances wherein human life is endangered." Thus, the state was required to prove that the defendant was legally confined to the Winn Parish jail at the time of his "intentional departure."
A mistrial is a drastic remedy and, unless mandated by La.C.Cr.P. art. 770, it is within the sound discretion of the trial court. If substantial prejudice results which would deprive the defendant of a fair trial, a mistrial is warranted. State v. Jarman, 445 So.2d 1184 (La.1984).
La.C.Cr.P. art. 770 provides in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the ... district attorney ... during the trial or in argument, refers directly or indirectly to:
. . .
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.
Evidence of other crimes is generally inadmissible in the guilt phase of the trial unless the probative value of the evidence outweighs its prejudicial effect and other safeguards are met. State v. Hamilton, 478 So.2d 123, 129 (La.1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). Exceptions to the prohibition of references to other crimes exist when the state offers the evidence of other crimes to prove a material issue which has independent relevance for purposes other than to show the character of the defendant. State v. Thompson, 532 So.2d 1160 (La.1988).
La. C.E. art. 404(B)(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transition that is the subject of the present proceeding.
La.C.Cr.P. art. 720 provides that evidence "which relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding or other crimes for which the accused was previously convicted" shall be admissible without prior notice to the defendant.
The defendant's prior conviction falls within an exception to the inadmissibility of other crimes because the state offered it to prove a material issue, the legal confinement of the defendant, which has independent relevance other than to show the character of the defendant. Furthermore, pursuant to La.C.Cr.P. art. 720, the state was not required to give the defendant prior notice because the prior conviction for armed robbery was related to conduct that constituted an integral part of the offense of aggravated escape.
Pursuant to La.C.Cr.P. art. 841, a contemporaneous objection is necessary to preserve an error for appellate review. The defendant failed to preserve this issue for appellate review by not making a contemporaneous objection during the state's opening statement. Rather, the defendant made his objection out of the presence of the jury after Bearden and O'Neal had testified. There was a bench conference at the request of the defendant after the state's opening statement. If an objection was made at that time, it was not preserved for the record.
*965 Even if the "other crimes" evidence should have been held inadmissible, the trial error would be subject to a harmless error analysis on appeal. When the verdict is "surely unattributable to the error," the trial error is harmless. State v. Ingram, 29,172 (La.App.2d Cir.1/24/97), 688 So.2d 657, writ denied, 97-0566 (La.9/5/97), 700 So.2d 505. The defendant testified that he had been incarcerated for armed robbery. Thus, the evidence of defendant's prior armed robbery conviction was available to the jury, and the verdict is therefore "surely unattributable" to the state's reference to the aimed robbery conviction in its opening statement.

Assignment of error # 3. The defendant was illegally adjudicated an habitual offender.

La. R.S. 15:529.1(D)(1)(b) provides as follows:
Except as otherwise provided in this Subsection, the district attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact. The presumption of regularity of judgment shall be sufficient to meet the original burden of proof. If the person claims that any conviction or adjudication of delinquency alleged is invalid, he shall file a written response to the information. A copy of the response shall be served upon the prosecutor. A person claiming that a conviction or adjudication of delinquency alleged in the information was obtained in violation of the Constitutions of Louisiana or of the United States shall set forth his claim, and the factual basis thereof, with particularity in his response to the information. The person shall have the burden of proof by a preponderance of the evidence, on any issue of fact raised by the response. Any challenge to a previous conviction or adjudication of delinquency which is not made before the sentence is imposed may not thereafter be raised to attack the sentence.
In State v. Shelton, 621 So.2d 769 (La. 1993), the Louisiana Supreme Court discussed the state's burden of proof in a habitual offender proceeding as follows:
If the defendant denies the allegations of the bill of information, the burden is on the State to prove the existence of the prior guilty pleas and that defendant was represented by counsel when they were taken. If the State meets this burden, the defendant has the burden to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. If the defendant is able to do this, then the burden of proving the constitutionality of the plea shifts to the State. The State will meet its burden if it introduces a "perfect" transcript of the taking of the guilty plea, one which reflects a colloquy between judge and defendant wherein the defendant was informed of and specifically waived his right to trial by jury, his privilege against self incrimination, and his right to confront his accusers. If the State introduces anything less than a "perfect" transcript, for example, a guilty plea form, a minute entry, an "imperfect" transcript, or any combination thereof, the judge then must weigh the evidence submitted by the defendant and by the State to determine whether the State has met its burden of proving the defendant's prior guilty plea was informed and voluntary, and made with an articulated waiver of the three Boykin rights. (Footnotes omitted.)
The trial court adjudicated the defendant as a third-felony offender based on the following convictions: (1) simple robbery on September 26, 1995; (2) armed robbery on August 26, 1997; and (3) first degree robbery on March 25, 1998.
Although the state argued that the guilty plea colloquies from his predicate offenses were filed into the record, the defendant argues that the record is void of such guilty plea transcripts and contains only minute entries which the defendant *966 argues are insufficient to qualify as a basis to use the predicate offenses.
The defendant is correct that the guilty plea colloquies for his two prior offenses were not in this record. However, during the habitual offender adjudication hearing, the state filed into evidence the records of the three offenses which made the prior guilty plea colloquies part of this record. The minutes from the defendant's two previous guilty pleas indicate that questions asked by the court and the answers by the defendant were recorded and made a part of the record. This appellate record has now been supplemented with the defendant's guilty plea colloquies.
Even based upon the minute entries alone, the state has met its burden of proving the existence of the prior guilty pleas and that the defendant was represented by counsel when they were taken. The burden then shifted to the defendant to produce affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the pleas. Only if the defendant does this, which he did not do in this case, does the burden shift to the state to prove that the pleas were constitutional through a "perfect" transcript or some other means. State v. Shelton, supra.
The defendant made no written objection to the petition filed, no objection to the previous convictions prior to sentencing and no motion to quash the habitual offender bill of information. Therefore, the defendant is barred under La. R.S. 15:529.1(D)(1)(b) from directly attacking the validity of the prior offenses on appeal. This court will not consider this assignment of error. State v. Jones, 29,805 (La. App.2d Cir.9/24/97), 700 So.2d 1034. This assignment is without merit.

Assignment of error #4. The trial court erred in imposing a sentence that was unconstitutionally excessive and that was imposed without compliance with La.C.Cr.P. art. 894.1.

The trial court adjudicated the defendant as a third-felony offender based on the following convictions: (1) simple robbery on September 26, 1995; (2) armed robbery on August 26, 1997; and (3) first degree robbery on March 25, 1998. Pursuant to the Habitual Offender Law, if the present or previous conviction is defined as a crime of violence, a third-felony offender shall be imprisoned for the remainder of his natural life without the benefit of parole, probation, or the suspension of sentence. La. R.S. 15:529.1(A)(1)(b)(ii). Both first degree battery and armed robbery are defined as a "crime of violence." La. R.S. 14:2(13)(w), (x). Therefore, for this defendant, a sentence of life imprisonment without benefit is mandatory. Nevertheless, a sentence within statutorily authorized limits can be excessive. State v. Barnes, 28,835 (La.App. 2d Cir. 12/11/96), 685 So.2d 1148;
A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864; State v. Davis, 28,662 (La.App.2d Cir.9/25/96), 680 So.2d 1296. A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of discretion, this court does not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Washington, 29,478 (La.App.2d Cir.4/2/97), 691 So.2d 345; State v. Henton, 28,576 (La.App.2d Cir.9/25/96), 682 So.2d 777, writ denied, 96-2590 (La.3/27/97), 692 So.2d 391.
When addressing the trial court's lack of discretion in imposing a mandatory sentence for second degree murder in State v. *967 Rose, 606 So.2d 845, 854 (La.App. 2d Cir. 1992), this court stated that "[i]t would be a useless act for the judge to articulate reasons for imposing the sentence when he has no choice but to impose a statutorilymandated maximum penalty." This court has extended this rationale to cases dealing with a mandatory sentence under the Habitual Offender Law in State v. Ignot, 29,745 (La.App.2d Cir.8/24/97), 701 So.2d 1001, 1008.
The defendant contends that the only information available on this record to determine whether this sentence is excessive is his criminal history used to adjudicate him a third-felony offender. The defendant argues that the record does not contain any aggravating or mitigating factors which would justify the imposition of the life sentence without benefit of parole, probation or suspension of sentence. The trial court was not required to articulate reasons for imposing sentence because the defendant's sentence to life imprisonment without benefit of parole, probation, or suspension of sentence was mandatory. Furthermore, the trial court did order a pre-sentence investigation report after the defendant was found guilty of aggravated escape and first degree robbery. The sentence of life imprisonment without benefit of parole, probation or suspension of sentence does not shock this court's sense of justice in light of the crimes committed by the defendant and the harm done to society.
This assignment is without merit.

Error Patent:
La.C.Cr.P. art 930.8 provides that no application for post-conviction relief shall be considered if it is filed more than three years after "the judgment of conviction and sentence has become final." The trial court informed the defendant that the prescriptive period for post-conviction relief is three years from the date of "finality of this sentence." Since the court's admonishment is silent as to the "finality of this conviction," it is technically not in perfect compliance with La.C.Cr.P. art. 930.8.
However, common sense dictates that the finality of the sentence must be at the same time or after the finality of the conviction. Thus, this colloquy substantially complies with the statute and, although the trial court did not recite verbatim the terms of Art. 930.8, this glitch certainly does not rise to the level of error patent and is harmless.

DECREE
For the foregoing reasons, the convictions and sentence of the defendant are AFFIRMED.