STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-141

STATE OF LOUISIANA

VERSUS

COBY QUINTON CEASAR

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 29622-10
HONORABLE DAVID KENT SAVOIE, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Elizabeth A. Pickett, James T. Genovese, and Phyllis M. Keaty, Judges.

AFFIRMED.

John Foster DeRosier
14th JDC District Attorney
Karen C. McLellan
Assistant District Attorney
P. O. Box 3206
Lake Charles, LA 70602-3206
(337) 437-3400
COUNSEL FOR APPELLEE:
    State of Louisiana

Carey J. Ellis, III
Louisiana Appellate Project
707 Julia St.
Rayville, LA 71269
(318) 728-2043
COUNSEL FOR DEFENDANT- APPELLANT:
    Coby Quinton Ceasar

**PICKETT, Judge.**

## FACTS

On July 28, 2010, the defendant, Coby Quinton Ceasar shot and killed his stepfather, Patrick Myles, at his mother's home at 628 Dixy Drive in Lake Charles.

The defendant was indicted for second degree murder, a violation of La.R.S. 14:30.1, on September 16, 2010. On June 27, 2013, a jury unanimously found the defendant guilty as charged. The trial court imposed the mandatory sentence of life imprisonment without benefit of parole, probation, or suspension of sentence on July 15, 2013.

## ASSIGNMENT OF ERROR

On appeal, the defendant asserts one assignment of error:

> The State failed to present sufficient evidence to support the verdict of second degree murder.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR

The defendant contends the state failed to present sufficient evidence to support the verdict of second degree murder. He argues the state failed to show he was not acting in self-defense when he shot the victim.

*State ex rel. D.P.B.,* 02-1742, pp. 4-6 (La. 5/20/03), 846 So.2d 753, 756-57 (footnote omitted), sets forth the standard of review by an appellate court when the defendant in a homicide case asserts a claim of self-defense:

> "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard

enunciated by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville,* 448 So.2d 676, 678 (La.1984). . . . Furthermore, in a case in which defendant asserts that he acted in self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. *State v. Brown,* 414 So.2d 726, 728 (La.1982). When defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Matthews,* 464 So.2d 298 (La.1985).

Second degree murder is defined as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1. The defendant claims the murder was committed in self-defense. Louisiana Revised Statutes 14:20(A)(1) defines justifiable homicide:

A homicide is justifiable:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

In *State v. Patterson,* 10-415, p. 13 (La.App. 5 Cir. 1/11/11), 63 So.3d 140, 149, *writ denied,* 11-338 (La. 6/17/11), 63 So.3d 1037, the fifth circuit noted:

The determination of a defendant's culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. [*State v.*] *Theriot,* 07-71 at 12, [La.App 5 Cir. 6/26/07),] 963 So.2d [1012] at 1020. The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. *Theriot,* 07-71 at 13, 963 So.2d at 1020.

Further, discussing self-defense in a second degree murder conviction, this court held:

The standard in La.R.S. 14:20 is whether the Defendant's subjective belief that he was in danger was reasonable. *State v. Brown,* 93-1471 (La.App. 3 Cir. 5/4/94), 640 So.2d 488.

> Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Hardeman,* 467 So.2d 1163 (La.App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Brown,* 414 So.2d 726 (La.1982).

*State v. Spivey*, 38,243, p. 6 (La.App. 2 Cir. 5/12/04), 874 So.2d 352, 357.

> In cases where the defendant claims self-defense as a justification, the absence of a weapon from the victim's person or immediate reach is often a critical element of the state's proof. *See State v. Davis,* 28,662 (La.App. 2d Cir.9/25/96), 680 So.2d 1296. . . . The absence of [a] weapon on the victim, however, is not dispositive of the issue.

> . . . .

*State in Interest of D.S.,* 29,554, p. 3 (La.App. 2 Cir. 5/7/97), 694 So.2d 565, 567.

*State v. Griffin,* 06-543, pp. 8-9 (La.App. 3 Cir. 9/27/06), 940 So.2d 845, 851, *writ denied*, 07-2 (La. 9/14/07), 963 So.2d 995.

In the matter before us, the police answered a dispatch call to 628 Dixy Drive at 12:04 a.m. on July 28, 2010, in response to a shooting. They found Patrick Myles, the defendant's stepfather, inside a bedroom, lying on the lower level of a trundle bed on the ground with blood underneath him and no pulse.

3

Talisha Myles and her son, Patrick Myles, Jr. ("P.J."), identified the defendant, also her son, as the shooter. Talisha described the clothing the defendant was wearing and advised he was armed with a handgun.

Around 6:15 a.m. on July 28, after a call from Talisha advising police the defendant was at her house, a SWAT team went into the residence and found wet clothing matching the earlier description of what the defendant was wearing when he left the crime scene. The defendant, however, was gone. Around 11:15 that morning, Nina Jones, the victim's sister, advised police the defendant was at her residence at 620 Dixy Drive. The detective division and the SWAT team returned to the area. They apprehended the defendant, whom Detective Franklin Fondel of the Lake Charles Police Department identified at trial, inside the residence, under a box spring mattress in a back bedroom.

Detective Fondel's offense report indicated that on the scene P.J. told the detective he saw his father and the defendant "fighting in the bedroom," and he went to his mother's bedroom to tell her. He then ran to Ms. Jones's residence. On his way back to 628 Dixy Drive, Detective Fondel saw the defendant leave the residence. Detective Fondel agreed that if P.J. saw the defendant exit his house as he was coming from his aunt's house, he could not have witnessed the shooting. Detective Fondel believed the offense report was incorrect.

Ms. Jones testified the victim left her home with his wife, Lynda Miles, and returned sometime after 11:30 p.m.[1] They talked for about ten minutes, and the victim "went back to where he was staying at 628." "[A] little while later," P.J. came to Ms. Jones' home frantic and hysterical, saying something about his daddy.

---

[1]Although the victim was married to Lynda, he had been living with Talisha, his ex-wife, for about a month prior to the shooting. P.J. referred to Lynda as his dad's "step-wife."

4

As she went outside, she saw the defendant "pass right in front" of her. He had his hands folded, and he told her "he shouldn't have came [sic] at me sideways." Jones ran to 628 Dixy Drive and saw her brother on the ground, and she saw blood. She went back outside and saw the defendant run toward Jerry Lee Street and disappear from sight.

The next day, Jones saw the defendant again, this time in her back yard "between the fence and the mall fence . . . [l]aying down, I guess hiding." Jones called the police. The defendant "worked his way in [her] house," and police apprehended him there.

Although Jones had seen the victim and the defendant argue before, it had never "gotten physical." She said she never saw the victim discipline the defendant.

The defendant was born in 1988 and lived with Talisha and the victim until around 2004, when he moved out at age sixteen because "he was tired of all the arguments and the unnecessary whippings . . . [t]o him, [and to] the siblings." The defendant then went to live with Talisha's mother. He "[s]ometimes" spent the night at Talisha's home, "[m]aybe once a month, if it was that."

Although Talisha whipped the defendant "sometimes if he did something wrong," the victim "pretty much did all the discipline." Talisha testified the victim "would whip with a belt; or if he wanted to use his hand, he would." He whipped the defendant "on the bottom." Talisha believed the whippings sometimes were too violent and left marks. On one occasion, the victim "hit him in the face with a belt buckle" when the defendant was "[m]aybe in between the age of 6, maybe." The victim had a bad temper "[a]t times" and "would get upset about it and just – wouldn't know how to just, you know, leave it alone." He was strict with all the

5

children; Talisha "didn't agree with all of it because they were kids and deserved to have fun."

On the night of the shooting, Talisha was asleep in the master bedroom when the victim came home. Talisha testified P.J. woke her to tell her the victim and the defendant were fighting. Talisha "got up instantly" and went into the bedroom. The defendant told Talisha he had told the victim he was on the phone. The victim "was just carrying on" about not having kids being disrespectful. She recalled telling police the victim said, "I'm your daddy[,]" and the defendant said, "you ain't my daddy." Talisha left the room to call Nina "because Nina always had a way to talk to [the victim] to, you know, calm him down when he was upset." Nina had come to help them before when the victim was angry.

When Talisha saw the defendant and the victim arguing, the victim was standing in front of the defendant at the front of the trundle bed, and the defendant was on his knees on the higher bed. "They were pretty close . . . face to face." After she left the room, she could still hear them arguing. She tried to call Nina, and she heard shots.

Talisha testified P.J. left her house on his own after she called Nina, and he had not returned to Talisha's house when Talisha heard the gunshots. Talisha did not see him in her house, and she knew he would always go to Nina for help. She did not believe he was present at the shooting. Talisha recalled telling police the defendant opened fire and left out of the door. She testified she "should have said shots fired," but she was hysterical and "couldn't word out [her] facts the way that [she] should have." She gave the statement about three hours after the incident, but she did not say what she meant. She testified she heard the argument but did not see the shots fired, and she did not really know what happened in the bedroom.

The defendant passed her as he left the house, and she did not see a firearm when "[h]e just walked past [her], looked [her] in the face, and he walked out the door." Talisha had never seen the victim or the defendant with a firearm, and she was surprised when she heard shots in her house.

The next day, the defendant knocked on Talisha's back door, and she let him inside. She left her home and called "the detective." She was aware the defendant was arrested later that day at Nina's house after a SWAT team located him hiding under a box spring.

The defendant gave two statements, the first around 1:20 p.m. on July 28, 2010. He told police he was in the bedroom talking to a girl on a cell phone. The victim came in and said he wanted to use the phone. The defendant told him he would let him know when he was finished. The victim returned to the room; the defendant told him, "I'm almost done, my dog." The victim responded, "I'm not your dog." When the victim "braced up," the defendant asked, "What, I'm supposed to be scared of you?" The defendant told police the pair fought, and the victim pulled a pistol from his waistband. They fought on the bed some more, and the defendant grabbed the gun and shot twice. He told police he was afraid for his life. The defendant told police the victim "was tripping," but he did not know what kind of drugs he may have used. He said "stuff" was going on in the family, and his sister had moved to her boyfriend's home because the victim "was tripping." There was already a "little beef" between the defendant and the victim.

The defendant reenacted the incident for police. When the lead investigator, Detective Richard Harrell of the Lake Charles Police Department, told the defendant they did not believe him, the defendant changed his story.

In his second statement, the defendant repeated his initial argument with the victim and said they wrestled, and the victim threw him on the dresser. They wrestled more, and the victim was about to attack the defendant again when the defendant pulled a gun from under the blanket of the bed. The defendant said the victim charged him and tried to get the gun. The defendant gave a second reenactment reflecting the second statement's version of the shooting.

Throughout the statements and reenactments, the defendant said he shot the victim in self-defense. When he admitted the victim did not have a weapon, he asked, "Isn't it still self-defense?" The defendant explained he "got jumped" when he was seventeen, and the "dudes" almost killed him. After being almost beaten to death in school, the defendant said he was "almost shell-shocked," and said no one was going to touch him. He said his "mind is just messed up" and commented, "when you [sic] angry, you don't think, just react." He said he always had a gun with him.

Detective Harrell believed, based on his experience, the defendant was more truthful in the second interview than he was in the first. However, in the second statement, the defendant said he dropped the gun on Lena Street. He later went with police to that location, but apparently, they did not find the gun.

P.J. gave a statement at the Children's Advocacy Center (CAC) around 5:00 p.m. on the day of the shooting. His statement was consistent with what the defendant had said in his second statement, that the defendant retrieved the gun from under the blanket in what was normally P.J.'s room. P.J. said he was in his sister's room when his dad came home and wanted to use the phone. The defendant said no. P.J. heard a banging noise and fighting between his dad and the defendant, who were in his bedroom. He heard the defendant say, "come on, come

on, come on," and he saw him hit his dad in the head. His dad then hit the defendant. P.J. said he ran to his aunt's house, then ran back. He saw the defendant get a gun from under his pillow. His dad leaned over the defendant, and P.J. heard "pow, pow, pow." The defendant ran out of the house, and P.J. chased him down the street. The defendant pointed the gun at P.J. and started to cry. P.J. then ran home. He described the gun as black with orange at the top and bottom.

P.J. stated that at some time before this incident, the defendant had shown P.J. a gun and shot at a dog house in their back yard. When P.J. was "real small," his dad and the defendant had fought when his dad told the defendant he could not go outside, and he had slapped the defendant.

P.J. was eight days away from his twelfth birthday at the time of the CAC interview. He was fourteen at the time of trial. He testified at trial his dad nicely asked him to tell the defendant to get off the phone; the defendant nicely said no. P.J. went into the kitchen, and his dad went into the room with the defendant. They began to fight. The victim punched the defendant first. P.J. went to get his mom and heard a loud noise. His mom tried to get them to stop fighting, but they did not listen. He said he saw the defendant pull out a gun and shoot his dad three times, while his dad was trying to get the gun from the defendant. P.J. ran to Nina's house to tell her what happened, then ran back toward home. The defendant was running out of the house, and P.J. tried to follow him. P.J. called to the defendant, who was holding the gun but did not point it at him. The defendant was crying. P.J. returned to Nina's house.

According to P.J.'s trial testimony, his dad and the defendant "always fought . . . like punches in the face." However, he then said that occurred "[w]hen [he] was 5." They fought about everything, and his dad started the fights. As

9

concerned the defendant, his dad had a bad temper. P.J. knew the defendant had a gun and had seen it the previous Fourth of July.

When asked who started the fight the night of the murder, P.J. testified, "[m]y brother – I mean my dad." He thought his dad was going to hurt the defendant in this fight, which was worse than those P.J. had seen before. P.J. admitted his story at trial was different from what he had said in the CAC interview "[b]ecause I barely remember half of the stuff now." He did not remember saying the defendant saying "come on, come on" and hitting his dad, with his dad hitting back. He said at trial his dad hit the defendant first, and he knew that was different from what he said previously. He did not know why his mom, Talisha, said she never saw them fighting because she went into the room, and they did not stop fighting.

P.J. admitted he was telling about his dad and the defendant throwing punches back and forth for the first time at trial. He said the defendant bent down to retrieve the gun from under a pillow on the lower bed and shot his dad three times at point-blank range while his dad was trying to get the gun. He also said the defendant shot four times. He testified he watched all this from the kitchen. P.J. first said he left the home after the defendant and went to Nina's house after going to talk to his dad. He then followed the defendant and never went back to his house. However, he then said he left the house before the defendant. Again P.J. next said the defendant left the house before he did, while he was talking to his dad, and he followed the defendant from the house. He denied the defendant actually pointed the gun at him. He said he could not tell how close the defendant was to his dad at the time he shot him.

Photographs admitted into evidence suggest P.J. could not have seen the shooting in his bedroom from the kitchen. The view from the kitchen into the bedroom would not allow P.J. to see the part of the room where the victim was shot. P.J.'s testimony about seeing the shooting and about when he went to Nina's house was inconsistent.

Daric Vezia was the defendant's cellmate at the Calcasieu Correctional Center from July 29 to August 26, 2010. Detective Harrell received a call from Nina on August 26, 2010, reporting the defendant's cellmate had called her with information about the location of the gun. Detective Harrell contacted Vezia, who had been released from jail and "was extremely helpful," relaying what the defendant had told him, including where the firearm could be located.

According to Vezia, the defendant knew Vezia would be released before the defendant would be, and he wanted Vezia to go get the firearm. He gave Vezia directions and asked him to retrieve the weapon. He also told Vezia "his mother was supposed to try to help him get out and say something that wasn't true, you know, to try to help him get out . . . [a]bout his stepdaddy used to beat on him or something like that." Vezia testified the defendant told him he shot the victim because "[t]hey was [sic] arguing over the phone, and he said he got tired of his stepdad messing with him." The defendant said they argued, and he shot the victim twice in the chest with a nine millimeter weapon he hid "on a project houses [sic] on Dixy Drive."

Detective Harrell drove Vezia to the area the defendant described to him. Vezia said the gun could be found in a black plastic bag under a bush behind a house. Vezia took Detective Harrell, based on the directions the defendant had given him, to 688 Carol Street. Detective Harrell located a black plastic bag

11

wedged between a trash can and a bush. He obtained a search warrant and found the gun in the bag exactly as witnesses had described it: "a semi-automatic weapon with orange – orange markings on the top, on the front side, the firing pin." Detective Harrell considered the gun unique because orange markings normally identified a gun as a toy, "something to let you know it's not real." The gun held one Luger 9mm bullet, the same as the two casings found at the murder scene. Vezia admitted at trial he talked to police because he was trying to get a better deal on charges against him. Admitted into evidence was a copy of a letter Vezia wrote to Judge Wilford Carter about those charges. The letter stated "Bill Durrant and [Vezia] made a deal that all charges be ran [sic] concurrent [sic] because the statements and the murder weapon was found on the [Defendant's] case that was the deal me and D.A. made." Nevertheless, according to the letter, charges were brought against Vezia before he was sentenced

On cross-examination, Vezia testified he had previously made deals with the Sheriff's Department's anti-drug task force (CAT team) for money. He disagreed with defense counsel's suggestion that he cooperates with authorities every time he is in prison to do whatever he can to get out. Vezia commented the defendant "shouldn't have opened his mouth and started telling everybody about the murder . . . running his mouth in the dorm, telling everybody."

Vezia testified he had no way of knowing whether the information he reported from the defendant on August 27, 2010, was true or false. He had no way of knowing the defendant used a 9mm pistol, two shots were fired, or where the gun could be found. He simply relayed to detectives the information he received from the defendant.

Stephanie Minor testified at trial. She said she spoke to the defendant on her cell phone from 11:44 p.m. on July 27 until 12:02 a.m. on July 28, 2010. She "heard a male in the background," but she did not know who it was. She heard no loud noises during her conversation. The defendant had bragged to Stephanie about having a gun when they had dated "[m]aybe seven years ago." He told her "he didn't have to fight nobody. He could just shoot them." The defendant used to complain about problems he had with the victim. He told Stephanie "he didn't like the discipline" and complained "about washing dishes and stuff like that." He never told her about being hit or about any kind of physical violence.

The bullet, casings, and gun were submitted twice for ballistics tests.[2] Paul Slocum, firearms examiner with Integrative Forensics Laboratories, qualified as a ballistics expert in firearms investigation. He determined "the individual characteristics of the cartridge cases of the bullets matched the individual characteristics that were generated by the pistol." Thus, Mr. Slocum concluded the casings and bullets submitted to him by the Lake Charles Police Department were fired from the gun also submitted by Lake Charles police.

Dr. Terry Welke, Calcasieu Parish coroner, performed an autopsy on the victim. His report indicated the victim sustained two gunshot wounds on the trunk. He recovered a medium-caliber bullet from each wound. Both wounds occurred in a front to back, left to right, and downward direction. The autopsy report indicated both gunshots were "fired at an indeterminate range." At trial, Dr. Welke explained he cannot determine the distance from which a gun is fired when that distance exceeds about two feet. Dr. Welke testified he found no bruising on the

---

[2]Neither examiner from the first round of tests was available for trial, so the items were submitted for a second examination and testimony by Paul Slocum. He did not review the report of the first tests until after he concluded his examination.

body, but he also said it was difficult to see bruising on an African-American male. He looked for lacerations or bruising in the facial area where the victim may have been hit, but he saw none. The autopsy report showed no drugs in the victim's system. It contradicts P.J.'s testimony that the shooting was at point-blank range.

The defendant's own statement does not support his claim of self-defense. P.J. and Talisha testified about incidents where the victim struck the defendant. Talisha testified the victim hit the defendant in the face with a belt buckle, but that occurred when the defendant was around age six. In the CAC interview, P.J. said his dad and the defendant had fought, but that was when P.J. was "real small," apparently years before the shooting. P.J. also said the defendant and the victim fought by punching each other in the face, but that was when P.J. was five years old, approximately seven years prior to the shooting.

Although the defendant stated he and the victim had problems in their relationship, he used as an example that he did not like the victim making him wash dishes. Although he supposedly moved out of Talisha's home at age sixteen because of the arguments with and unnecessary whippings from the victim, the alleged abuse occurred six years prior to the shooting. The defendant only occasionally spent the night at Talisha's home, and the victim had only lived there for about a month at the time of the shooting. The defendant's testimony establishes he and the victim were only occasionally around each other, and it is unlikely such an acrimonious relationship developed that the defendant would feel sufficiently threatened to believe he had to shoot the victim in order to protect himself.

The defendant explained his "mind is just messed up." He simply reacts to anger; he does not think. He always carried a gun at the time of the shooting, and

he bragged to Stephanie Minor about doing so seven years before the shooting, apparently anticipating violence even then. Although both the defendant and P.J. said the defendant and the victim were fighting, Talisha never said anything about hearing anything other than arguments. She never mentioned noises indicative of wrestling, throwing someone against the dresser, or struggling for a gun as the defendant testified he and the victim did.

Daric Vezia's testimony was validated when police located the gun exactly where he said the defendant told him it would be. Vezia knew things about the incident he could not have known unless someone with intimate knowledge had told him. According to Vezia, the defendant said he was tired of the victim messing with him, and he shot him while they argued about a phone.

Although the defendant claims self-defense, he admitted the victim was not armed. The victim's body showed no evidence of a physical fight. Nothing in the record suggests the defendant had any reason to expect he was facing a life-threatening situation during the argument with the victim. The evidence does not support a finding that the defendant shot the victim out of fear for his life. Under these circumstances, the defendant could not have reasonably believed his life was in danger. He never made any effort to extricate himself from the argument or the fight.

Even if the defendant believed the defendant might physically injure him, there is no evidence that the amount of force used, which resulted in the victim's death, was necessary to prevent the harm. The state met its burden of showing the defendant did not act in self-defense. The jury reasonably found the defendant did not shoot the victim in self-defense. The evidence was sufficient under the *Jackson* standard to support the conviction. The defendant's conviction is affirmed.

**AFFIRMED.**