987 So.2d 375 (2008)
STATE of Louisiana, Appellee
v.
James C. CRANDELL, Appellant.
No. 43,262-KA.
Court of Appeal of Louisiana, Second Circuit.
June 18, 2008.
*376 Louisiana Appellate Project, by Annette F. Roach, for Appellant.
James C. Crandell, J. Schuyler Marvin, District Attorney, John M. Lawrence, Michael O. Craig, Assistant District Attorneys, for Appellee.
Before STEWART, GASKINS and PEATROSS, JJ.
STEWART, J.
The defendant, James Carl Crandell, was found guilty of second degree murder and sentenced to life imprisonment at hard labor without the possibility of parole. He now appeals his conviction based on the introduction at trial of testimony given in a prior proceeding. Finding no reversible error, we affirm the defendant's conviction and sentence.

FACTS
On the morning of August 21, 1989, two maids at the Beacon Manor, a motel in Bossier City, Louisiana, discovered the body of Charles Parr in a closet in Room 15. Parr had been beaten to death. The motel owner, Margie Theodos called the *377 police. The investigation focused on the most recent occupants of Room 15, namely, James Carl Crandell and his girlfriend, Gail Willars. The couple was traveling with Willars' 8-year-old son, Zachary. From the motel's phone records, the police learned that the missing occupants had placed calls to a residence in Chicago, Illinois. Crandell and Willars were arrested by Chicago police at the residence identified from the phone records and, after waiving formal extradition, they returned to Louisiana.
Crandell and Willars were indicted for first-degree murder and tried together in February 1991. A jury found Crandell guilty of first degree murder and Willars guilty of second degree murder. Because the jury could not reach a unanimous verdict in Crandell's penalty phase, Crandell and Willars both received life sentences. Their convictions were affirmed on appeal.[1] However, Crandell obtained federal habeas corpus relief in August 2004, and his conviction and sentence were vacated. See Crandell v. Cain, 421 F.Supp.2d 928 (W.D.La.2004).
Thereafter, a Bossier Parish grand jury again indicted Crandell for first degree murder, but the state ultimately amended the indictment to a second degree murder charge. On September 21, 2007, the state filed a motion notifying the defendant that it intended to introduce as evidence the transcribed testimony of Margie Theodos, Gail Willars, and Zachary Willars from the 1991 trial. The state asserted that all three were unavailable as witnesses; Ms. Theodos was deceased, Gail Willars had opted not to testify on Fifth Amendment grounds, and Zachary could not be located. The defendant objected to the introduction of the testimony on the grounds that the previous trial had been vacated as an absolute nullity, that Gail Willars had not persistently refused to testify, and that the state had not made adequate efforts to locate Zachary.
In support of its motion, the state introduced a copy of a newspaper obituary for Margie Theodos stating that she died on February 23, 2007, and informed the court that Ms. Theodos' husband and son were also deceased. The trial court overruled the defendant's objection that the obituary did not prove that the decedent was the same Margie Theodos who had testified at the first trial and allowed the obituary to be introduced. The trial court also found that Crandell's right to confront and cross-examine witnesses was not impacted by use of the prior testimony by the three unavailable witnesses and rejected the argument that the testimony could not be used because his prior conviction had been vacated.
Trial commenced on September 25, 2007. During a recess and outside of the jury's presence, the trial court again took up the matter of the unavailability of Theodos, Willars, and Zachary. With regard to Zachary Willars, the state called Amy Noonan, felony supervisor for the Bossier Parish District Attorney's ("BPDA") office, to testify about efforts to locate Zachary. Noonan testified that the BPDA tried to locate Zachary, who was now an adult, about a year and a half prior to trial based on information that he had been in several psychiatric hospitals in Houston, Texas. However, he was not located at any of those facilities. In June 2007, BPDA obtained a material witness warrant for Zachary's last know address at a hospital in Houston and at four other addresses, *378 two in Houston and two in Chicago. But upon learning that he was probably in California, no effort was made to serve the Houston or Chicago addresses.
Noonan testified that she conducted computer searches for Zachary for "months." On September 20, 2007, she searched Accurint.com, Whitepages.com, Nlets.org, and the National Crime Information Center for information on his whereabouts. Noonan found various tenants at the addresses the BPDA had for Zachary, and she discovered the names of an aunt and uncle who lived in Texas. Noonan contacted these relatives, who told her that Zachary had been in a mental institution in California approximately one and a half years ago; however, they did not know where Zachary could be found. Noonan attempted to have Zachary served at an address in Coarsegold, California, without success. Likewise, a summons mailed to another possible address in Camarillo, California, was returned undeliverable. Finally, Bossier Parish District Attorney Schuyler Marvin testified that he had recently spoken with Zachary's mother Gail, who told him that she did not know where he could be found.
With regard to Ms. Theodos, Noonan testified that an Accurint search for her name returned a result with a "D," indicating that she was deceased. Although Noonan was not able to obtain a death certificate or other proof of death through the coroner's office, a cousin of Ms. Theodos confirmed that she had died and a copy of the obituary from the local newspaper was obtained. A former neighbor also confirmed Ms. Theodos' death.
Finally, the trial court addressed Gail Willars' unavailability. Willars, who was continuing to contest her conviction through a petition for certiorari to the United States Supreme Court, informed the trial court that she was relying on her Fifth Amendment right not to testify in Crandell's case. Her petition had been returned to her with instructions to provide additional information and refile it before "the end of October." She provided a copy of her petition to the BPDA.
Regarding her son Zachary's whereabouts, Willars told the court:
I believe he's somewhere in Los Angeles. [Willars said she did not know his address.] He may possibly testify, but I don't believe you would get any results from him because he is extremely mentally ill. He is, to my knowledge, living somewhere on the street. He's been in a forensic facility where he has just been released from recently and he's doing drugs and he's in pretty bad shape. He's been in and out of mental institutions for the last few years.
The court then asked Willars whether she would invoke the privilege against self-incrimination if she were questioned by the state or the defense about the events of August 21, 1989, and she replied, "Yes, sir."
The trial court ruled that all three witnesses were unavailable and that the state could use the transcripts of their prior testimony as evidence against the defendant by allowing them to be read to the jury by members of the court's staff. The defendant objected to the ruling.
Trial resumed on September 26, 2007, with the presentation of Ms. Theodos' testimony from the first trial. The court informed the jury that the testimony was "from a prior proceeding." Ms. Theodos testified that Crandell and Willars began renting a room at the motel in mid-July 1989. On August 21, 1989, they were due to be evicted for non-payment of rent. Although Theodos said that the Beacon Manor rented rooms for as little as an hour at a time, supplied free condoms to *379 its customers, and had free adult movies, she denied problems with prostitution. At the end of Theodos' testimony, the defense objected to references in the transcript to Crandell and Willars being "in court" and to one reference to the word "trial." The objection was overruled.
After additional testimony, the transcript of Gail Willars' testimony was read. Willars met Crandell in 1987, while living in Fayetteville, Arkansas, and married to Jerry Wayne Willars. After her husband was killed in a tractor accident during a hayride in November 1987, Willars received $150,000 in death benefits and monthly payments of $2,500 from her husband's former company. She became close friends with Crandell, and they began traveling together. During a trip to Georgia to scatter her husband's ashes, Crandell introduced Willars to cocaine. Thereafter, she supplied Crandell with money to buy drugs; she claimed the drugs took away her pain and grief. They traveled throughout Texas, Arkansas, and Louisiana, living in motels and using about a pound of cocaine per week. They were arrested for possession in Cass County, Texas, in March 1988, and Willars was arrested again on a drug charge in Houston. They were separated for a time while Crandell was put in the custody of the Texas Department of Corrections, and while she was on probation. Upon Crandell's release, they began traveling again, this time with her son, Zachary.
By the summer of 1989, Willars was out of money except for the monthly payments, which were sent to her father's address in Houston. Because Crandell was "in violation of his parole," the pair did not want to drive back to Houston for the checks, so Willars' father cashed the checks and wired the money to her wherever she happened to be. In July 1989, their location was Bossier City. Willars testified that they had spent all the money for the month, so they sold their car for $250 to pay for a place to stay. When they ran out of money again by the middle of August, Crandell suggested that she prostitute herself to obtain money for rent. Willars noted that they were using little, if any, cocaine at this point due to lack of funds.
On the morning of August 20, the day they were to be evicted from the motel, Willars tried unsuccessfully to call her father for money. While she was at the payphone, Parr drove up to her and asked if she needed a ride and whether she was a working girl. Willars initially declined his advance, but she eventually agreed to perform oral sex for $30. Willars and Parr entered the motel room and began to disrobe. Willars claimed that Parr called her a whore, cursed and demanded additional sexual favors, so she told Parr that she had AIDS. He became enraged and picked her up. Willars testified that Crandell appeared and hit Parr on the head with a small stick, which shattered. The two men fought until Crandell brandished a knife. Willars described Crandell as "screaming and wild-eyed and crazy looking, acting like a lunatic." She said that Crandell bound Parr's hands with duct tape and, later, with bungee cords, then forced Parr into a closet. While she and Crandell argued, Parr managed to untie himself and burst out of the closet. Parr grabbed a frying pan, and the two men began fighting over it. Willars said that as she tried to separate them she heard crying and saw Zachary in the bathroom. She told the men to stop because of the child in the room. She testified that Parr stopped fighting but that Crandell grabbed the frying pan and began hitting Parr on the head. Crandell then choked Parr into submission until he fell to the floor. While Crandell put Parr's body back in the closet, she cleaned the room a little. She *380 recalled that many items were spattered with blood. She and Crandell loaded the contents of their room into Parr's vehicle and left with Zachary. They drove to a McDonald's where they bought food with money found in Parr's car, and then they began driving to the home of Crandell's friend in Chicago.
When asked about statements she made to the Chicago police about the locations of weapons used in the encounter with Parr, she professed to a poor recollection of those statements. She also testified about letters that Crandell wrote to her while they were jailed in Louisiana. In the letters, which were introduced as the states' exhibits 52, 53, and 54, Crandell wrote about a possible insanity defense, his desire not to go to a mental institution, and his claim that what happened to Parr was the result of either self-defense or an accident. Parr wrote:
[N]o, I don't want to spend years or the rest of my life in a mental hospital. No, I don't want my brain probed and picked apart by people and made a spectacle. And as you know, I don't want to be executed or spend the rest of my life in prison.... What happened in that room was an accident and nothing but an accident. I just hope these people believe that.... Gail, he was alive when I put him in the closet and we left that motel. I told you he was dead because I thought you'd want to call an ambulance and have him taken to the hospital and I was in one hell of a state of panic. And all I wanted to do was get the hell away from there. I didn't think he was going to die. I thought the worse that might happen was that they would put a warrant on us for robbery. I didn't think I hit him that hard. After I told him to leave you alone and asked him to leave and when he refused and when we started to fighting, I kind of lost it there for a minute. That man was strong and all I could think of was that if he beat and hurt me what would he do to you.
Ex. S-54.
Next, the 1991 testimony of then 9-year-old Zachary Willars was read to the jury. Zachary testified that he and Crandell, who had a knife in his hand, were in the bathroom when his mother and Parr entered the motel room and began undressing. The bathroom door was open, and he could see the rest of the room through a mirror. He testified that Crandell jumped out of the bathroom wielding the knife. His mother picked up a stick and started hitting Parr on the head, while Crandell put down the knife and watched. Zachary said that Crandell then taped Parr's mouth and hands and put him in the closet. Because Parr continued to make noise, Crandell took him out of the closet and "started hitting [Parr] on the head" with a frying pan that Gail had handed him. At that point, Gail told him to stop when she noticed Zachary, and she shut the bathroom door. Zachary testified that he then heard a sound like "dragging [Parr] to the closet." When Zachary came out of the bathroom a few minutes later, Crandell opened the closet door, pointed to Parr's body, and laughed. Zachary said that Crandell took Parr's wallet. The three then packed up and drove Parr's car to Chicago. Zachary also testified that Parr never hit his mother or Crandell.
After the state rested, the defense objected to the introduction of other crimes evidence, namely Crandell's use of cocaine as well as his drug conviction and parole violation, mentioned in the transcript of Gail Willars' testimony. The defense also objected to the repeated references to the jury trial in Willars' testimony, such as questions beginning, "Tell the jury...." Similar objections were made with regard to Zachary's testimony, particularly a reference *381 to the fact that the previous trial was a first-degree murder trial. The trial court overruled these objections.
Crandell did not testify, and the defense rested. The jury returned a unanimous verdict of guilty as charged of second degree murder. Motions for post-verdict judgment of acquittal and a new trial were filed and denied. Crandell was sentenced to life imprisonment at hard labor without the benefit of parole.

ASSIGNMENTS OF ERROR
Appellate counsel filed an appeal asserting eight assignments of error alleging that the trial court erred in (1) allowing introduction of the transcripts when the prior conviction had been found null and void; (2) concluding that Gail Willars was unavailable based on her claiming the Fifth Amendment right even though she had previously waived that right and testified at the prior trial; (3) concluding that a sufficient effort was made to locate Zachary Willars; (4) allowing the introduction of Gail Willars' testimony which, because she had testified on her own behalf at the prior trial, included evidence in this trial that would have been inadmissible if she was called on direct examination by the prosecution; (5) depriving the jury of the opportunity to observe and weigh the credibility of witnesses whose transcribed testimony was introduced as evidence; (6) failing to redact references in the transcripts to the prior jury trial for first degree murder and to other crimes evidence; (7) allowing improper references by the prosecution in closing argument to possible sentences when the defendant was facing a mandatory life sentence; and (8) failing to grant a mistrial due to the introduction of evidence in violation of the criminal code and the defendant's constitutional rights.
Additionally, Crandell filed two pro se assignments of error. The first alleges that the structural defect caused by discrimination in the selection of the grand jury in the prior proceeding rendered the indictment, trial, and verdict absolute nullities and divested the trial court of jurisdiction such that the evidence in that first trial was not legally obtained. The second alleges that his retrial violated double jeopardy for the reason that the structural error and resulting jurisdictional defect made the first trial an absolute nullity. We note that Crandell neither briefed nor argued his second pro se assignment of error; hence it is abandoned. U.R.C.A., Rule 2-12.4.

DISCUSSION

Inadmissibility Due to Nullity of Prior Proceeding:
Crandell's first pro se assignment of error and appellate counsel's first assignment both complain that the transcripts of testimony by Theodos, Willars, and Zachary should have been inadmissible. They assert that the prior conviction had been reversed for a structural defect and the entire proceeding was therefore an absolute nullity.
Crandell's 1991 first degree murder conviction was reversed by a federal court upon finding that the grand jury was tainted by racial discrimination. This is a structural error that is not subject to harmless error analysis. Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986).
In denying Crandell's writ application challenging the state's second effort to seek the death penalty, this court observed that the entire 1991 proceeding was "nullified" or "void ab initio." State v. Crandell, No. 39,905-KW (La.App. 2d Cir.2/23/05), unpublished. The arguments *382 on these assignments of error are based on this court's statements. However, the statements relied upon from the writ denial are dicta and were criticized by Justice Johnson in her dissent in State v. Crandell, XXXX-XXXX, p. 10, 924 So.2d at 133:
In fact, neither the district court nor the court of appeal cited any authority for the proposition that an indictment returned from a grand jury tainted by racial discrimination renders all subsequent proceedings void ab initio. While an indictment tainted by racial discrimination constitutes a structural defect in the proceedings exempt from harmless-error analysis ... this Court has long held that a defendant must raise the error in a timely manner, i.e., by way of a pre-trial motion to quash, or he waives it.
Citations omitted. See also State v. Langley, XXXX-XXXX (La.5/22/07), 958 So.2d 1160 (fn.7):
We do not subscribe to the appellate court's broad view that structural errors or defects necessarily constitute the functional equivalent of jurisdictional defects which render the proceedings not merely voidable but absolutely null.
We note that Crandell and Willars were tried together in the first proceeding and that only Crandell has obtained a reversal of his conviction. Willars' conviction has not been reversed, and the prior proceeding remains entirely viable as to her.
Crandell cites no authority, nor have we found any, for the proposition that the testimony from his former trial must be excluded based on the reversal of his initial conviction because of racial discrimination in the grand jury process. We find that the reversal of Crandell's prior conviction for a structural defect in the grand jury process does not render that proceeding an absolute nullity and does not preclude the introduction of testimony adduced in the first trial as evidence in the second trial so long as such evidence otherwise satisfies constitutional and statutory safeguards. Accordingly, we find no merit to these assignments of error.

Unavailability of Witnesses
Appellant counsel's second, third, fourth, and fifth assignments of error all pertain to whether there was a sufficient showing that Willars and Zachary were unavailable and whether allowing their transcribed testimony to be read deprived the jury of the opportunity to assess their credibility. There is also the complaint that Gail Willars' unavailability allowed the state to introduce otherwise inadmissible evidence that the state would not have been able to elicit on direct examination without a proper foundation being laid.
Determining the unavailability of a witness is a preliminary question for the trial court. La. C.E. art. 104(A). Such determinations are subject to manifest error review and will not be overturned absent an abuse of discretion by the trial court. State v. Ball, 2000-2277 (La.1/25/02), 824 So.2d 1089, cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002).
Unavailability is governed by La. C.E. art. 804, which provides in relevant part:
A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
(1) Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement;
(2) Persists in refusing to testify concerning the subject matter of his *383 statement despite an order of the court to do so;
. . .
(4) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness, infirmity, or other sufficient cause; or
(5) Is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means. A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrong-doing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination....
The defendant asserts that the state's efforts to locate Zachary were perfunctory. To the contrary, the testimony of Amy Noonan established that BPDA made a good faith and diligent effort to locate Zachary, who from all indications had become a transient. It became apparent during the investigation that Zachary had been hospitalized in mental institutions during his adult life and that he had no fixed or permanent address or employment. His mother explained that he might be living somewhere on the street in Los Angeles and that he had been using drugs. Even with powerful cross-referenced databases, the BPDA was unable to determine his whereabouts. The state's two efforts to issue subpoenas for Zachary are not indicia of a lack of effort; rather, the state's investigation simply revealed no likely locations to which a subpoena could or should be sent. The trial court did not err in finding Zachary to be unavailable.
Next, the defendant argues that Gail Willars should not have been found unavailable to testify and her 1991 testimony should not have been admissible in the 2007 trial. At the time of the 2007 trial, Willars had pending a petition for certiorari before the U.S. Supreme Court to challenge her 1991 conviction. Because both Crandell and Willars had been indicted by the same grand jury and Crandell's conviction had been reversed due to racial discrimination in the selection of the grand jury foreman, it is reasonable to assume that Willars' efforts to have her conviction overturned were not hopeless or futile. Rather, Willars' petition was pending, and its success depended on whether she timely asserted her rights, a question which had not been conclusively answered. The trial judge accepted that Willars was in the process of refiling her federal petition and that finding is not manifestly erroneous on this record that contains a copy of Willars' petition to the U.S. Supreme Court. Under these peculiar circumstances, the trial court did not err in finding Willars to be unavailable.
Referring to La. C.E. art. 804(B)(1), the defendant argues that Gail Willars' 1991 testimony should not have been introduced. He reasons that in the 1991 trial he did not have a "similar motive to develop the testimony by direct, cross, or redirect examination." He argues that because Willars was also on trial in 1991, she had every interest in shifting the blame for the crime to Crandell rather *384 than onto herself. Finally, he complains that use of Willars' prior testimony allowed the state to introduce evidence, such as Willars' statement to the Chicago police, that would not otherwise have been admissible.
Article 804(B)(1) is a firmly-rooted exception to the hearsay rule. State v. Ball, supra. Former testimony given by a declarant who is unavailable as a witness is admissible if the party against whom it is offered "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." La. C.E. art. 804(B)(1). In State v. Ball, supra, the Court addressed the requirements for the admissibility of prior testimony:
This Court has held that use of the prior testimony must not impinge on the defendant's constitutional right to confront and cross-examine adverse witnesses, as guaranteed by the Sixth Amendment of the United States Constitution, Art. I, § 16 of the Louisiana Constitution, and La.Rev.Stat. § 15:273. To protect these constitutional rights, certain conditions must be met before the prior testimony may be introduced: (1) the defendant must have been represented by counsel at the earlier hearing; (2) the witness must have testified under oath; (3) the witness must have been cross-examined (or there must have been a valid waiver of the right to cross-examination); (4) at the time of trial, the witness must be "unavailable" to testify; and (5) the State must have made a good faith effort to locate the unavailable witness. These jurisprudential criteria are subsumed in La.Code Evid. art. 804(B)(1), permitting the use of prior recorded testimony of an unavailable declarant as an exception to the hearsay rule.
(Citations omitted.)
The record shows that the conditions set forth in Ball are met in this instance for the admissibility of Willars' prior testimony. As discussed, Willars was "unavailable" to testify in the 2007 trial due to the pending review of her conviction. Crandell was represented by counsel in the 1991 trial. Willars testified in that proceeding under oath. In 1991, Crandell was able to fully question Willars. The original transcript of Willars' testimony is 181 legal-sized pages long, the first 67 of which consists of Willars' testimony on direct examination by Crandell's attorney. Crandell's counsel also questioned her on redirect. From our review of Willars' transcript, we have no difficulty in concluding that Crandall had every full and fair opportunity and a similar motive to thoroughly question Willars and develop her testimony at the original trial.
Finally, Crandell complains that the jury was deprived of the ability to assess the credibility of the witnesses whose prior testimony was read in court. The effect of that deprivation, though real, is subsumed into the protections provided by the Confrontation Clause and the statutory codification of its interpretation. The admission of former testimony is permitted by the Confrontation Clause and by statute. Therefore, we find no merit in this complaint.

Failure to Redact Prior Testimony
The sixth assignment of error asserts that the prior testimony, particularly that of Gail Willars, included inadmissible references to other crimes as well as to the fact that the prior proceeding was a first degree murder case tried before a jury.
The most serious issue concerns the inclusion of other crimes evidence in Willars' testimony. La. C.E. art. 404 provides in part:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is *385 not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
In State v. Miller, 98-0301 (La.9/9/98), 718 So.2d 960, the supreme court observed:
Several other statutory and jurisprudential rules also play a role in determining the admissibility of such evidence. First, one of the factors listed in Article 404(B) "must be at issue, have some independent relevance, or be an element of the crime charged in order for the evidence to be admissible." State v. Jackson, 625 So.2d 146, 149 (La.1993). Second, the state is required to prove the defendant committed these other acts by clear and convincing evidence. Id.; State v. Davis, 449 So.2d 466 (La. 1984). Third, even if independently relevant, the evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403. Finally, the requirements set forth in State v. Prieur, 277 So.2d 126 (La.1973) must be met.
In the instant case, through the 1991 testimony of Gail Willars, the jury heard evidence that the defendant had been a heavy user of cocaine for at least the year prior to this offense, that he had been arrested and convicted for a drug offense, and that he was in violation of his parole at the time of this offense. However, Crandell's cocaine use and prior conviction were irrelevant to his "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident" with respect to this offense. The motive for the offense, as related by Willars, was for Crandell and Willars to obtain money to pay their rent, not to buy cocaine. Crandell's intent to kill the victim was clearly an issue in this case, but evidence of Crandell's prior drug use had no bearing on that issue; there was no evidence that Crandell was using cocaine at the time of the murder. The evidence of Crandell's and Willars' cocaine binge in the year before this crime simply had no relevance to the presentation of the state's case in this trial. The other crimes evidence tended to show that Crandell was a person of bad character, because he had been a heavy drug user and had been convicted of that crime. It also tended to emphasize Crandell's moral role in these events; Willars depicted Crandell as the reason why she herself became addicted to cocaine.
We find that the trial court should not have allowed these references to be read to the jury under the guise of La. C.E. art. 804. Indeed, it is unclear whether the trial court actually made a ruling on the admissibility of the other crimes evidence apart from its ruling admitting the prior testimony under La. C.E. art. 804. The existence of other crimes evidence in prior testimony can easily be determined from a reading of that testimony, and the defendant made timely objections to the introduction of this evidence. By allowing the jury to hear repeated references to inadmissible other crimes evidence, the trial court erred.
*386 When other crimes evidence is improperly admitted at trial, the erroneous admission is a trial error and is subject to harmless error analysis on appeal. State v. McGee, 39,336 (La.App. 2d Cir.3/4/05), 895 So.2d 780; State v. Bratton, 32,090 (La.App. 2d Cir.6/16/99), 742 So.2d 896. Trial error is harmless where the verdict rendered is "surely unattributable to the error." State v. McGee, supra; State v. Bratton, supra.
Although the evidence of Crandell's cocaine use and conviction tended to portray him in a bad light, the evidence was hardly so damning as to have affected the verdict. The jury heard that neither Crandell nor Willars was under the influence of drugs at the time of this offense, something that might have interfered with Crandell's ability to form specific intent. In addition, the jury heard evidence through Crandell's letters that this killing was "an accident," and they had to choose between that alternative, manslaughter and second-degree murder. Most importantly, there was overwhelming circumstantial evidence that Crandell intended to kill Parr to steal his property, so the verdict was surely unattributable to any error related to the inadmissible evidence of Crandell's other crimes.
Crandell also complains that the trial court should have excluded references in the former testimony to the fact that the case was then being tried, that the charge was first degree murder, and that it was before a jury. In addition, he urges that the testimony of Gail Willars included references to witnesses who testified at the 1991 trial but not at the 2007 trial. See, e.g., State v. Lee, 346 So.2d 682 (La.1977). The trial court should have made a greater effort to excise these unnecessary references from the prior testimony before allowing it to be presented to the jury. However, the references, although not infrequent, were vague and do not reflect that Crandell had previously been convicted of first degree murder. We find that any error in this respect is surely harmless and that this assignment of error is without merit.

Remarks in the State's Closing Argument
The seventh assignment of error complains that the trial court erred in allowing the prosecutor to make the following statement during closing argument:
Don't be concerned when you get back in the jury room. You will never hear the judge tell you y'all have to figure out a sentence if you convict him and come back and tell him how much the sentence would be  ten years, five years, fifty years. You don't do that. The sentence is not up to you. The judge will impose the appropriate sentence.
Appellant counsel claims Crandell was prejudiced by the suggestion to the jury that he could receive a sentence between five and fifty years when he was actually facing a mandatory life sentence.
The defense did not object to this statement when made, so the issue may not be raised for the first time on appeal. La. C. Cr. P. art. 841. Also, because manslaughter is one of the responsive verdicts for second degree murder and because there is no minimum sentence for manslaughter, defense counsel would not necessarily have had a basis for objecting to the statement. We find no merit in this assignment of error.

Mistrial
The eighth and final assignment of error urges that a mistrial should have been granted because of the cumulative effect of errors in the proceeding that violated Crandell's rights to a fair trial.
The cumulative effect of assignments of error that themselves are without *387 merit does not warrant reversal of a conviction. State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218, 239. The only palpable errors in Crandell's trial concerned the admission of other crimes evidence through the testimony of Gail Willars, but as noted, that testimony was hardly so prejudicial as to have affected the verdict. This assignment of error is without merit.

ERROR PATENT
Our review of the record reveals that the trial court did not adequately advise the defendant of the time period within which to apply for post-conviction relief. We now advise the defendant that no application for post-conviction relief, including applications seeking out-of-time appeals, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C. Cr. P. arts. 914 or 922.

CONCLUSION
Having found no merit to the assignments of error asserted in this appeal, we affirm the conviction and life sentence of the defendant, James Carl Crandell.
AFFIRMED.
NOTES
[1] See State v. Crandell, 604 So.2d 123 (La. App. 2d Cir.1992) and State v. Willars, 27,394 (La.App. 2d Cir.9/27/95), 661 So.2d 673.