GASKINS, J.
 

 |, The defendant, Jatazz Rashun Warren, was convicted of three counts of second degree murder and one count of attempted second degree murder. For these offenses, he was sentenced to serve, respectively, three consecutive terms of life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence and one consecutive term of 50 years’ imprisonment at hard labor, also without benefit of parole, probation or suspension of sentence. The defendant appeals. We affirm his convictions and sentences.
 

 FACTS
 

 On March 9, 2006, in Monroe, Louisiana, a Chrysler PT Cruiser crashed into the back of a Honda Odyssey minivan which was stopped at a red light on Highway 165 North. Three of the four people in the van died from injuries they sustained in the crash, and one person in the PT Cruiser was gravely injured, never to walk again. The two occupants of the PT Cruiser were the defendant and his girlfriend, Lamesha Anderson.
 
 [1]
 

 
 *527
 
 Lamesha and the defendant began dating in high school and later lived together in Shreveport. The relationship was marred by numerous acts of violence by the defendant toward Lamesha. In March 2005, the police responded to their residence and found Lamesha sitting in a car in the driveway, her nose bloodied; although the police arrested the defendant, the couple continued to live together. On another occasion, the defendant threatened Lamesha with a gun. Placing the weapon to her head, he told her that he would kill her if she ever left him and then kill himself.
 

 | ¡¡In early 2006, Lamesha worked for a Shreveport tax preparer. A co-worker, Carla West, said that the defendant always drove Lamesha to work and then often drove by the office several times during the day, sometimes parking across the street. Ms. West saw Lamesha and the defendant engage in frequent arguments; she also observed Lamesha appear at work with a black eye, a knot on her forehead and bruises.
 

 In about February 2006, Lamesha’s mother, who lived in Monroe, became ill and was hospitalized. Lamesha traveled to Monroe to visit her mother in the hospital. According to Lamesha, the defendant called her every day, insisting that he needed her and demanding that she come home to him. She returned to Shreveport to live with the defendant.
 

 On March 1, 2006, Lamesha’s mother died. That same day, the defendant locked himself in the bathroom of their home with a gun, threatening to shoot himself in the head. Shreveport police responded to Lamesha’s call; the defendant was hospitalized under an emergency commitment as a result. The police found the defendant’s handgun in the bathroom.
 

 After this incident, Lamesha returned to Monroe and stayed with her brothers and sisters at her mother’s home. About two days later, the defendant was released from the hospital; he drove the PT Cruiser to Monroe to be with Lamesha. She informed the defendant that she planned to stay and live in Monroe, and she said that the defendant seemed to initially accept that. However, her sister Monica (a.k.a. “Monicat”) later saw Lamesha arguing with the defendant and saw the defendant grab laLamesha’s arm; Monica overheard the defendant say to Lamesha “If I can’t have you, no one can.” Monica also stated that the defendant said, “I’m telling you, Monicat, I kidnap her ass if I have to.” She had also seen the defendant choking Lamesha. Lamesha said that on the evening of March 8, 2006, the defendant insisted that she return to Shreveport with him.
 

 On the morning of March 9, 2006, the defendant and Lamesha were at her home in Monroe with her family.
 
 [2]
 
 One of Lame-sha’s sisters, Aleisha Anderson, saw the defendant and Lamesha arguing and fighting inside the home. Aleisha testified that the defendant told Lamesha “If you can’t be with me, won’t nobody have you”; he also threatened to kill her. Aleisha said that the defendant then put his hand around Lamesha’s neck and forced her out of the home. Aleisha said that Lamesha was wearing red pajamas when she left the home.
 

 From that house, the defendant drove Lamesha to Monica’s house in Monroe. While the defendant stayed in his PT
 
 *528
 
 Cruiser in the driver’s seat, Lamesha went to Monica’s front door and spoke to Monica; Monica gave Lamesha $20.00, and the two left.
 

 Later that morning, Delhi Police Officer Stephen Mahon, Jr. was driving his personal vehicle southbound on U.S. Highway 165. He observed a silver PT Cruiser in front of him “driving very erratically, speeding up, slowing down.” The driver was a black male; he also saw a black female passenger, who was either in the front seat or the rear passenger seat. According to Officer Mahon, he could tell that the couple |4was having an altercation of some sort. At one point, the female passenger opened the door and tried to get out of the vehicle. Clothes flew out of the vehicle as the driver pulled her back in. Officer Mahon called the Louisiana State Police and reported the driver. The officer said that the PT Cruiser made a U-turn and that he stopped following the car at that point.
 

 Also driving on Highway 165 that morning was Jamie Stapleton. Mr. Stapleton was traveling northbound and passed the PT Cruiser while it was southbound, before it made the U-turn. He observed the PT Cruiser coming head-on at him in his lane. It swerved, and the passenger door came open; he could tell that there was some sort of “tussling” going on. According to Mr. Stapleton, the driver of the PT Cruiser was a black male. Mr. Stapleton continued on his trip until he stopped at the red light at the intersection of Highway 165 and Highway 15. Mr. Stapleton’s Ford truck was in the outside lane at the light; next to him in the inside lane was a Mazda sedan. As he waited for the light to change, a green Honda Odyssey van pulled up behind him.
 

 Louisiana State Trooper John Wyles responded to the radio call on the PT Cruiser and saw the vehicle after it made the U-turn and was headed north. Trooper Wyles, driving an unmarked truck equipped with emergency lights and a siren, followed the car. He observed that a black male was driving the car. The trooper pursued the car at speeds between 80 and 85 miles per hour. He was still following the PT Cruiser when it approached the intersection of Highway 165 and Highway 15. The trooper said that he IfiWatched the PT Cruiser accelerate as it came up on the stopped traffic and crashed into the back of the green Honda van. The trooper said:
 

 Just shortly before the crash, ... within,- I wouldn’t even say seconds, it drifted slightly across the shoulder, the white fog line, probably a foot and then it was not a swerve or jerk or anything like that, it was just a slight drift and it came back
 
 into
 
 the travel lane and it was under full acceleration at that point.
 

 When the PT Cruiser hit the back of the van, the trooper observed a black female being ejected through the windshield of the passenger’s side of the PT Cruiser. There was no physical evidence to suggest that the defendant tried to brake or avoid the crash. Police found pink cloth fibers and long hair in the windshield on the passenger’s side, and the headrest on the passenger’s front seat was missing, suggesting that Lamesha was in the rear seat when she was ejected.
 

 The driver of the green van was Maureen Gibson, an Ohio resident. The other passengers in her van were her parents, James and Patricia Shalala, and her 11-year-old daughter, Halle. The family had come to Louisiana to see Ms. Gibson’s son, a soldier being deployed from Ft. Polk to Afghanistan. At the time of the crash, they were on their way back home to Ohio. The PT Cruiser hit the right rear of the Odyssey and crushed the back of the van. James and Patricia Shalala died at the
 
 *529
 
 scene; Halle was grievously injured and died the next day in the hospital.
 

 Lamesha Anderson was gravely injured. She suffered a brain injury that left her completely unconscious for at least two weeks (and destroyed her memory of the accident) and a spinal cord injury that has left her |fiparalyzed from the waist down. According to her doctor, she will never walk again or have a memory of the accident.
 

 The defendant was also ejected from the car and injured. After he arrived at the hospital by ambulance, he never asked a nurse about Lamesha’s condition. However, according to the nurse, when he was asked what had happened to Lamesha, the defendant said “she wanted to die and I was trying to help her out.”
 

 Upon the defendant’s release from the hospital, police arrested him for three counts of negligent homicide and one count of negligent injuring. He was subsequently indicted on three counts of second degree murder and one count of attempted second degree murder.
 
 [3]
 

 Prior to trial, the state gave several
 
 Prieur
 
 notices of intent. These issues were extensively litigated in the trial court and before this court.
 

 Following a trial in September 2007, a unanimous jury convicted the defendant as charged. After the trial court denied the defendant’s post-verdict motions for new trial and acquittal, it sentenced the defendant to serve three consecutive sentences of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence and one consecutive sentence of 50 years’ imprisonment at hard labor, also without benefits. The defendant filed a motion to reconsider sentence, which was denied.
 

 The defendant now appeals, urging six assignments of error.
 

 ^SUFFICIENCY OF EVIDENCE
 

 The defendant argues that the evidence adduced at trial was insufficient to support his convictions of three counts of second degree murder and one count of attempted second degree murder. Specifically, the defendant contends that the state failed to prove that the crimes occurred during the defendant’s commission of a second degree kidnapping of Lamesha Anderson or as a result of his intent to kill her.
 

 Law
 

 When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under
 
 Hudson v. Louisiana,
 
 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt.
 
 State v. Hearold,
 
 603 So.2d 731 (La.1992);
 
 State v. Bosley,
 
 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347,
 
 writ denied,
 
 97-1203 (La.10/17/97), 701 So.2d 1333.
 

 The
 
 Jackson
 
 standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Robertson,
 
 96-1048
 
 *530
 
 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Hill,
 
 42,025 (La.App. 2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529;
 
 State v. Gilliam,
 
 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508,
 
 writ denied,
 
 2002-3090 (La.11/14/03), 858 So.2d 422.
 

 La. R.S. 14:30.1 provides, in part:
 

 A. Second degree murder is the killing of a human being:
 

 (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
 

 (2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
 

 La. R.S. 14:27 provides, in part:
 

 A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
 

 In order to convict a defendant of attempted second degree murder, the state must prove beyond a reasonable doubt that the defendant had the specific intent to kill.
 
 State v. Bishop,
 
 2001-2548 (La.1/14/03), 835 So.2d 434, citing
 
 State v. Huizar,
 
 414 So.2d 741 (La.1982). Proof of specific 19intent to inflict great bodily harm is insufficient.
 
 State v. Martin,
 
 92-811 (La.App. 5th Cir.5/31/94), 638 So.2d 411. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1);
 
 State v. Bishop, supra,
 
 citing
 
 State v. Butler,
 
 322 So.2d 189 (La.1975), and
 
 State v. Martin, supra.
 

 Discussion
 

 The eyewitness testimony and physical evidence were sufficient to prove beyond a reasonable doubt that the defendant was the driver of the PT Cruiser and that he specifically intended to kill Lame-sha when he crashed his car into Ms. Gibson’s van. All of the witnesses believed that the driver of the vehicle was a black male, and Mr. Stapleton was positive that the driver was a black male. The jury heard extensive testimony on this point including exhaustive cross-examination by the defendant. Further, the physical evidence showed that Lamesha was the person who was ejected from the passenger’s side of the PT Cruiser and that she was likely in the back seat when the crash occurred. The state’s proof of the defendant’s identity as the driver was sufficient.
 

 The witness with the best view of the crash was Trooper Wyles; he saw the PT Cruiser in the last moments before impact and he saw the crash occur. The trooper watched the defendant’s car shift its position on the road away from the shoulder and back into the lane where Ms. Gibson’s van was stopped, and the trooper saw the defendant’s car accelerate from its already high speed as it raced toward the van. The photos of the crime scene depict a shockingly severe crash.
 

 
 *531
 
 ImThis evidence, along with the defendant’s acts and statements before and after the crash, is sufficient to prove that the defendant deliberately crashed his car into another car at an extremely high speed. Compare
 
 State v. Shaw,
 
 41,233 (La.App. 2d Cir.8/23/06), 939 So.2d 519,
 
 writ granted,
 
 2006-2467 (La.5/18/07), 957 So.2d 160,
 
 affirmed,
 
 2006-2467 (La.11/27/07), 969 So.2d 1233. Thus, the state provided proof beyond a reasonable doubt that the defendant specifically intended to kill Lamesha at the time of the crash. Because the defendant had the specific intent to kill Lamesha and, while having that intent, committed the overt act of crashing into an occupied van, the offense of second degree murder was fully proven as to the victims in the van.
 
 [4]
 

 In its answer to the defendant’s bill of particulars, the state responded that it intended to prove the attempted second degree murder of Lamesha in that the defendant tried to kill himself or Lamesha, or that he attempted to kill a human being while he was engaged in the perpetration of second degree kidnapping. The defendant complains that insufficient proof was presented to show that he committed second degree kidnapping.
 

 Because the defendant possessed the specific intent to kill at the time of the crash, it is unnecessary to address in detail his claim of insufficient proof of second degree kidnapping. Nevertheless, the evidence was more than sufficient to prove that the offense happened during a second degree kidnapping. Several witnesses testified that Lamesha was trying to escape Infrom the speeding car before the crash, and clearly the defendant did not allow her to do so. Further, multiple witnesses testified that the defendant threatened to use force in order to have Lamesha return to live with him. Additionally, she was physically injured during the kidnapping. See La. R.S. 14:44.1. That evidence is sufficient to support a finding that the crash happened in the course of a second degree kidnapping.
 

 This assignment of error is without merit.
 

 CHALLENGES FOR CAUSE
 

 The defendant argues that the trial court erred in denying seven defense challenges for cause.
 

 Law
 

 In
 
 State v. Anderson,
 
 2006-2987 (La.9/9/08), 996 So.2d 973, the Louisiana Supreme Court restated the well-settled law regarding jury selection and the appellate review of rulings on challenges for cause:
 

 The Sixth Amendment of the United States Constitution guarantees the accused the right to a trial by an impartial jury. La. Const, art. I, § 17 guarantees the right to full voir dire examination of prospective jurors and to challenge those jurors peremptorily. The number of challenges is fixed by law. This Court in
 
 State v. Allen,
 
 95-1754 (La.9/5/96), 682 So.2d 713, 722-23, has stated:
 

 Therefore, when a defendant uses all of his peremptory challenges, a trial judge’s erroneous ruling depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the con
 
 *532
 
 viction and sentence. [Citations omitted.]
 

 La. Const, art. I, § 17(A) provides that a defendant has a right to challenge jurors peremptorily, with the number being fixed |iaby law_ Therefore, when a defendant uses all of his peremptory challenges, a trial judge’s erroneous ruling depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence. A defendant must object at the time of the ruling on the refusal to sustain a challenge for cause of a prospective juror. LSA-C. Cr. P. art. 800.
 

 Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and the defendant has exhausted his peremptory challenges. Thus, “[t]o prove there has been reversible error warranting reversal of the conviction and sentence, defendant need only show (1) erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges.” The trial judge is vested with broad discretion in ruling on challenges for cause, and his ruling will only be reversed when review of the entire voir dire shows the trial judge abused his discretion. [Citations omitted]
 

 La. C. Cr. P. art. 797 provides, in part:
 

 The state or the defendant may challenge a juror for cause on the ground that:
 

 [[Image here]]
 

 (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
 

 [[Image here]]
 

 (4) The juror will not accept the law as given to him by the court; ...
 

 Specific Jurors
 

 The defendant exhausted his peremptory challenges, and he now complains that his challenges for cause of the following jurors were erroneously denied.
 

 | ^Karen Myers had two relatives who had been police officers and was friends with members of law enforcement; however, she did not personally know any of the police witnesses in this case. She stated that police officers were human and did not always tell the truth. Ms. Myers had been in a car accident years before for which she received chiropractic treatment. Twenty years ago, she was also the victim of physical domestic abuse. However, being employed at a mental health facility, she encountered other abuse victims daily and did not feel that the case would distress her. The court denied the defendant’s challenge for cause because it believed Ms. Myers’ statements that she could be fair and impartial.
 

 Michael Newton recalled news accounts of the accident which stated that the defendant was the driver. The court rejected the defendant’s first challenge for cause on the grounds that Mr. Newton’s demean- or was direct and deliberate and he stated he could be fair and impartial. Mr. Newton also said that if he were the defendant, he would not want someone like him to serve on the jury. The court recalled Mr. Newton for further questioning after the defendant challenged him for cause a second time, and Mr. Newton said that he would not hold the defendant’s silence against him because that was the defendant’s right and there are several reasons why the defendant might choose not to
 
 *533
 
 testify. After fairly extensive further questioning of Mr. Newton by both sides on this point, the court accepted his statements that he would not hold the defendant’s silence against him and denied the defendant’s challenge for cause.
 

 luFelicia Sledge had also seen media coverage of the accident. She confirmed that her exposure to this coverage would not hinder her ability to be fair and impartial, and she said that she did not know enough about the situation to determine whether the news reports were accurate. She said that she could set aside the reports in deciding the case. The court accepted Ms. Sledge’s answers as true and rejected the defendant’s challenge for cause. Ms. Sledge actually served on the jury.
 

 David Winkler was likewise aware of some facts of the accident due to news accounts. Mr. Winkler repeatedly confirmed that he could set aside his prior knowledge of the case and judge the case based upon the evidence. He gave his impression that the defendant was the driver of the car but said that “a mistake could have been made” and that “[jjust the fact that someone is arrested does not make them guilty, no.” The court accepted Mr. Winkler’s statements as true and denied the defendant’s challenge for cause.
 

 Michelle Morris stated that, as a parent, viewing the photo of the body of 11-year-old Halle Gibson might bother her. However, she denied that viewing the photo would influence her to the extent that she could not review and consider the other evidence of guilt or innocence, and confirmed that she could still be fair even after viewing the photos. The court denied the defendant’s challenge for cause, stating that jurors aren’t required to leave their concerns for family outside the door; the court accepted Ms. Morris’ statement that she could be fair in evaluating and weighing the evidence.
 

 lisBobby Ann Williamson expressed disappointment that she would not hear the defendant’s side if he chose not to testify. Later, she definitively stated that she would not hold the defendant’s silence against him. The court denied the defendant’s challenge for cause as to Ms. Williamson because the court accepted her assertion that she would be able to apply the law as given by the court and respect the right of the defendant not to take the stand.
 

 Jack E. Brennon, Jr., was challenged for cause by the defendant on the grounds that he appeared to be “lost” during questioning and that his mind was somewhere else. The court denied the challenge, noting that it did not pick up on the characteristic that the defendant alleged; the court said that the juror may not have been as articulate as some of the other jurors, but Mr. Brennon did respond to the questions asked of him.
 

 Discussion
 

 Several of the challenged jurors had some knowledge of this case from the several media accounts reported locally. A juror need not be totally ignorant of the facts involved with the case.
 
 State v. Frank,
 
 1999-0553 (La.1/17/01), 803 So.2d 1,
 
 citing State v. Harper,
 
 430 So.2d 627, 636 (La.1983). If a juror who has acquired knowledge about the case through the media can sufficiently lay aside his or her impression of the defendant’s guilt or innocence and render a verdict based on the evidence presented, he or she is competent to serve as a juror.
 
 State v. Frank, supra.
 
 Mr. Newton, Ms. Sledge and Mr. Winkler all affirmed that they could decide the case fairly despite the knowledge of the case they gleaned from |1(ithe media. The trial court’s rulings on each of these challenges were based in large measure on the court’s
 
 *534
 
 observation of the jurors’ demeanor, a factor which cannot be measured on the written record. To the extent that the jurors’ temperament can be ascertained from the record, the record reveals no error by the trial court in its acceptance of the jurors’ answers.
 

 The court also correctly concluded that Ms. Myers’ relationship with a law enforcement officer did not disqualify her from service given her answers during
 
 voir dire.
 
 As this court said in
 
 State v. Gatti
 
 39,833 (La.App. 2d Cir.10/13/05), 914 So.2d 74,
 
 writ denied,
 
 2005-2394 (La.4/17/06), 926 So.2d 511:
 

 Although personal connections to and relationships with law enforcement personnel do not, by themselves, disqualify prospective jurors for cause, such associations and relationships are subject to careful scrutiny.
 
 State v. Alexander,
 
 620 So.2d 1166 (La.1993). The question is whether the prospective juror could assess the credibility of each witness independently of his relationship with law enforcement.
 
 State v. Carlos,
 
 618 So.2d 933 (La.App. 1st Cir.1993),
 
 writ denied,
 
 623 So.2d 1305 (La.1993). If bias or prejudice may be reasonably attributed to the relationship or association, the juror should be excused for cause.
 
 State v. Alexander, supra.
 

 Ms. Myers informed the court that she had respect for law enforcement officers but understood that “they’re still human” and “don’t always tell the truth.” The court did not err in rejecting this ground for the challenge to Ms. Myers. Likewise, her prior car accident and experience as a victim of domestic abuse were matters that Ms. Myers addressed in detail in her answers that the court reasonably accepted as true and supportive of her affirmance that she could be a fair and impartial juror. Similarly, Ms. Morris’ concern over viewing photos of the dead child was explored in 117detail and she likewise affirmed that she could be fair, impartial and objective. As for the defendant’s concern about Mr. Brennon’s demeanor, the trial court relied upon its observations of the juror in rejecting the defendant’s challenge, and the record does not undermine the court’s conclusion.
 

 Mr. Newton and Ms. Williamson initially expressed concern about their reaction should the defendant fail to take the stand and testify. During the
 
 voir dire
 
 process, all of the jurors were informed of the defendant’s right not to testify and the rule that no inference of guilt can be made from the defendant’s silence. After extensive questioning, both Mr. Newton and Ms. Williamson confirmed that they would follow the law and not hold the defendant’s silence against him. Given the pointed questioning and the jurors’ answers which the court accepted as honest, the court did not err in finding both of these jurors qualified to serve.
 

 The trial court’s rulings on these challenges depended heavily upon the court’s observation of the jurors’ demeanor and judgment of their credibility, factors which cannot be meaningfully evaluated on appeal. The record reveals that all of the challenged jurors affirmed that they could be fair and impartial and none of the jurors’ answers in
 
 voir dire
 
 suggest that the trial court committed manifest error in accepting those answers.
 

 This assignment of error is without merit.
 

 CHANGE OF VENUE
 

 In this assignment of error, the defendant asserts that the trial court erred in failing to grant his motion for change of venue, which claimed | isextensive and prejudicial pretrial publicity. At trial, the defendant submitted a variety of printed ma
 
 *535
 
 terials to the trial court in support of his motion for a change of venue. The materials included several stories about the incident in the local media, as well as evidence of the likely circulation or coverage of the stories. However, the court opted to consider the motion after the completion of
 
 voir dire
 
 in order to get an accurate impression of the impact of the media coverage on the venire. The defendant asserts that of the 72 potential jurors, 47 were questioned out of the presence of other jurors and, of those, 36 reported hearing media coverage of the event.
 

 Law
 

 La. C. Cr. P. art. 622 provides:
 

 A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending. In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
 

 In
 
 State v. Lee,
 
 2005-2098 (La.1/16/08), 976 So.2d 109,
 
 cert. denied,
 
 — U.S.-, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008), the supreme court explained the appellate analysis of a motion to change venue:
 

 In unusual circumstances, prejudice against the defendant may be presumed. See
 
 State v. David,
 
 425 So.2d 1241, 1246 (La.1983) (“[UJnfairness of a constitutional magnitude will be presumed in the presence of a trial atmosphere which is utterly corrupted by press coverage or which is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the | iaverdict of the mob.”). Otherwise, the defendant bears the burden of showing actual prejudice.
 

 A defendant must prove more than mere public general knowledge or familiarity with the facts of the case to have his trial moved to another parish.
 
 State v. Frank,
 
 99-0553 (La.1/17/01), 803 So.2d 1, 16 (no “bright line test for determining the degree of prejudice existing in the collective mind of the community ... the defendant must show the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case before trial”). A defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue merely by showing a general level of public awareness about the crime.
 
 State v. Clark,
 
 02-1463 (La.6/27/03), 851 So.2d 1055; see also
 
 State v. Huls,
 
 95-0541 (La.App. 1 Cir. 5/29/96), 676 So.2d 160, 172 (defendant was not entitled to change of venue of murder trial based on pretrial publicity, when thorough voir dire of prospective jurors was conducted, most jurors were questioned individually about their exposure to publicity, and all prospective jurors who could not make unbiased judgment based on their exposure to pretrial publicity and their inability to set aside that information were excused). However, courts must differentiate largely factual publicity from that which is invidious or inflammatory because they present real differences in the potential for prejudice.
 
 State v. Clark,
 
 851 So.2d at 1071.
 

 Whether a defendant has made the requisite showing of actual prejudice is “a question addressed to the trial court’s sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion.” Several factors are pertinent in
 
 *536
 
 determining whether actual prejudice exists, rendering a change in venue necessary, including: (1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the
 
 candor
 
 and veracity of the prospective jurors on voir dire. Moreover, the jurisprudence shows courts have examined the number of jurors excused for cause for having a fixed opinion as another gauge of whether prejudice exists in the public mind. [Citations omitted.]
 

 |
 
 znDiscussion
 

 The initial news reports of this incident included information that the defendant and Lamesha were fighting as their car sped down Highway 165 and identified the defendant as the driver; however, these initial reports did not suggest that he deliberately caused the crash. Later reports contained statements from Lamesha’s family quoting the defendant’s threats to Lamesha and also informed the public of the state’s theory that the defendant did not attempt to stop the car before the crash.
 

 Although some of the jurors had a good recollection of the press accounts, the parties conducted extensive examination of them concerning the influence these accounts would have on them. Based on the jurors’ answers, the trial court reasonably concluded that the defendant faced no prejudice from any effect the media coverage had on the jury pool. Although this incident was well publicized, none of the news accounts of this incident were particularly inflammatory; the news accounts were largely concerned with a recounting of the facts of the event and, later, with the fact that charges had been brought against the defendant. There were no factors shown to have influenced the jurors’ candor or veracity and no evidence of factors affecting the community or jurors’ attitudes toward the defendant. On this record as a whole, with particular attention to the entirety of
 
 voir dire,
 
 the trial court’s decision to maintain venue in Ouachita Parish was not an abuse of discretion.
 

 This assignment of error is without merit.
 

 L, EVIDENCE OF OTHER CRIMES, WRONGS OR ACTS
 

 The defendant argues that the trial court erred in allowing the state to introduce evidence of his prior crimes or bad acts. Among these were a suicide attempt, stalking, and his alleged membership in the “Ratchet Boys” gang.
 

 Law
 

 La. C.E. art. 404(B)(1) states as follows:
 

 B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412,
 
 evidence of other crimes, wrongs, or acts
 
 is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It
 
 may, however, be admissible for other purposes, such as proof of
 
 motive, opportunity, intent, preparation, plan, knowledge, identity,
 
 absence of
 
 mistake or
 
 accident,
 
 provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part
 
 *537
 
 of the act or transaction that is the subject of the present proceeding. [Emphasis added.]
 

 As the Louisiana Supreme Court explained in
 
 State v. Lee, supra,
 
 at 139:
 

 Generally, courts may not admit evidence of other crimes to show the defendant as a man of bad character who has acted in conformity with his bad character. However, the State may introduce evidence of other crimes if the State establishes an independent and relevant reason, i.e., to show motive, opportunity, intent, or preparation, or when the evidence relates to conduct which constitutes an integral part of the act or transaction that is the subject of the present proceeding. Nonetheless, the State must provide the defendant with notice and a hearing before trial that it intends to offer prior crimes evidence. Additionally, the State must prove the defendant committed the other acts. Furthermore, the other crimes evidence must tend to prove a material fact genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. [Citations omitted.]
 

 | as>When other crimes evidence is improperly admitted at trial, the erroneous admission is a trial error and is subject to harmless error analysis on appeal.
 
 State v. Crandell,
 
 43,262 (La.App. 2d Cir.6/18/08), 987 So.2d 375;
 
 State v. McGee,
 
 39,336 (La.App. 2d Cir.3/4/05), 895 So.2d 780. Trial error is harmless where the verdict rendered is “surely unattributable to the error.”
 
 State v. Crandell, supra; State v. McGee, supra.
 

 Suicide Attempt
 

 In its first
 
 Prieur
 
 notice, the state notified the defendant of its intent to use evidence of the defendant’s suicide attempt, but at a hearing on September 27, 2006, the state informed the defendant and the court that it did not intend to use evidence of the defendant’s suicide attempt at trial. However, the state included the suicide attempt in its next
 
 Prieur
 
 notice on January 9, 2007, and in its notice filed on February 21, 2007, the state pursued the introduction of evidence of the suicide attempt. The court held another
 
 Prieur
 
 hearing on March 2, 2007, at which time it ruled in favor of allowing the evidence. This court denied the defendant’s writ application.
 

 We find that the defendant’s suicide attempt was highly relevant and probative of the defendant’s state of mind and intent at the time of this incident. About a week before the crash, the defendant physically and verbally manifested an intent to end his own life in Lamesha’s presence. Although the state proved the defendant’s intent to kill Lamesha when the defendant crashed the car, the evidence also tended to show that the defendant intended to kill himself in the crash as well. Evidence of the defendant’s very recent suicide attempt was highly probative of the critical | ^issues of whether the defendant had the specific intent to kill at the moment of the crash and whether the crash was not accidental; therefore, the trial court correctly admitted this evidence.
 

 Stalking
 

 The defendant also urges that the trial court should not have admitted evidence of his conduct toward Lamesha at her place of employment, including his frequent presence at the workplace, his driving by and parking near the site, his demands that Lamesha leave work early and the co-worker’s observation of Lamesha with a black eye and a knot on her head. The defendant argues that these acts do not comprise the crime of stalking, La. R.S. 14:40.2, were irrelevant and contained
 
 *538
 
 hearsay, so they should not have been permitted as other crimes evidence.
 

 The defendant’s prior behavior toward Lamesha is highly probative of his intent at the time of this offense. Regardless of whether these acts prove the crime of stalking, they tend in the aggregate to show that the defendant sought to control Lamesha’s behavior and were highly probative of the defendant’s intent to kidnap her and force her to cooperate at the time of the crash. There was no objectionable hearsay in Ms. West’s testimony. This evidence was properly admitted. Even if improperly admitted, it was harmless error.
 

 The “Ratchet Boys”
 

 The state introduced evidence from several inmates that the defendant claimed to be affiliated with a group known as the “Ratchet Boys.” The state’s
 
 Prieur
 
 notice said that the Ratchet Boys were a gang, that the | ¡^defendant was a member of that gang, and that while hospitalized, the defendant contacted the gang to help him escape from the hospital. That evidence was not introduced, nor indeed was there any proof of what type of organization the Ratchet Boys comprised: a street gang, a car club or a barbershop quartet. Any error in the introduction of this evidence was harmless beyond a reasonable doubt.
 

 Allegedly Omitted Items
 

 The defendant also contends that the state failed to give him notice that it would introduce evidence of (1) arguments between the defendant and Lamesha at work and (2) the defendant asking Eddie Williams, a fellow inmate, to testify that the defendant was not driving the car at the time of the crash. The state asserts that the defendant had notice of both of these items of evidence. A
 
 Prieur
 
 notice given on February 21, 2007, gave notice of the state’s intent to introduce evidence that Ms. West saw the defendant come to Lamesha’s job “on numerous occasions, make a scene and demand that Lamesha leave work early.” This evidence was discussed in detail at a
 
 Prieur
 
 hearing on March 2, 2007. Further, Eddie Williams testified at a
 
 Prieur
 
 hearing on September 21, 2007 about his interaction with the defendant. Given the extensive pretrial examination into these matters, there is no evidence of prejudice to the defendant from any of this testimony.
 

 This assignment of error lacks merit.
 

 I ¡«MOTION FOR MISTRIAL
 

 In this assignment of error, the defendant contends that the trial court erred in denying his motion for mistrial based upon statements made by the prosecutor in closing arguments. Specifically, the prosecutor said:
 

 Did he care who died? Did he care? Did he care if he died? He said it before. He tried it before. I think he tried it with Jamie Stapleton. You have to make that decision. But at U.S. Highway 165 and Winnsboro Road I know he tried. I know the evidence shows that he tried. If I can’t have her, nobody will have her. I should not have said I know. The evidence shows.
 

 The defendant objected to this remark and moved for a mistrial, which the trial court denied. The defendant did not request an admonishment. The prosecutor continued:
 

 It’s not what I know. The evidence shows that you’re the one that has to know. What did he try to do at U.S. Highway 165? He tried to kill himself. ... Who was the main person that had to die? Who was it? It was Mei-sha.
 

 The prosecutor also said:
 

 [Ms. Anderson] left us some hair [when she went through the windshield]. She left her life.... All this cross examina
 
 *539
 
 tion about leaving hair. Which hair was this? You got any doubts? Excuse me. I apologize for that, Mr. Johnson. Ladies and gentlemen, what I think and what I say means nothing. You are the deciding factor in this. The evidence leaves no doubt.... The law. The judge will read this to you. The law is not what I say it is.... The facts are not what I believe it is. The facts are what you believe it is.
 

 The prosecutor’s remarks were not among that class of remarks proscribed by La. C. Cr. P. art. 770 which require the trial court to order a mistrial. We find no improper argument; however, even if the prosecutor did step outside the bounds of permissible argument, the trial court was afforded discretion about how to rule on the defendant’s motion.
 
 State v. Harrison,
 
 32,643 (La.App. 2d Cir.10/27/99), 743 So.2d 883,
 
 writ denied,
 
 1999-3352 (La.6/30/00), 765 So.2d 327;
 
 State v. Rice,
 
 31,871 (La.App. 2d Cir.3/31/99), 736 So.2d 956,
 
 writ denied,
 
 1999-1314 (La.10/15/99), 748 So.2d 464. In
 
 State v. Frost,
 
 1997-1771 (La.12/1/98), 727 So.2d 417, 432-33,
 
 cert. denied,
 
 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999), recognized as superceded by statute on other grounds in
 
 State v. Gomez,
 
 2000-0566 (La.1/17/01), 778 So.2d 549, the supreme court stated:
 

 The scope of proper closing argument is confined to “evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom and to the law applicable to the case.” However, a prosecutor is afforded considerable latitude in making closing arguments. As a general rule, the prosecutor may not use closing argument as a vehicle to express his personal opinions about the defendant when his opinion is expressed in a manner that the jury may understand has been formed from evidence outside of the record. Such an opinion is permissible if the prosecutor refers to, or it is apparent that his opinion is based on, the evidence of record.
 

 This Court has recognized as a matter of well-settled law that the prosecutor has the right to “press upon the jury any view of the case arising out of the evidence — the Supreme Court is bound to credit jurors with common intelligence, conscientiousness, and sense of duty.” Even when we have found the prosecutor to have exceeded the proper bounds of argument, this Court has often criticized the improper arguments without finding that they constituted reversible error. The standard by which this Court determines whether improper closing argument constitutes reversible error is whether it is “firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict.” [Citations omitted.]
 

 The prosecutor’s remarks, both prior to the motion for mistrial and thereafter, occasionally referred to what the prosecutor knew, but did not suggest that he had any information that was not before the jury. The prosecutor made it clear to the jury that the evidence, not the prosecutor’s [^knowledge of the case, should be the basis of the jury’s decision. There is no possibility that these comments by the prosecutor influenced the jury in any way; the prosecutor quickly informed the jurors that they were the ones to judge the evidence, and there was ample evidence in this case to support the verdicts. Because the trial court correctly denied the motion for mistrial, this assignment of error is without merit.
 

 EXCESSIVE SENTENCE
 

 The defendant argues that the imposition of three consecutive life sentences,
 
 *540
 
 followed by a 50-year sentence, is excessive.
 

 Law
 

 The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article.
 
 State v. Smith,
 
 433 So.2d 688 (La.1983);
 
 State v. Lathan,
 
 41,855 (La.App. 2d Cir.2/28/07), 953 So.2d 890,
 
 writ denied,
 
 2007-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions.
 
 State v. Hampton,
 
 38,017 (La.App. 2d Cir.1/28/04), 865 So.2d 284,
 
 writs denied,
 
 2004-0834 (La.3/11/05), 896 So.2d 57, and 2004-2380 (La.6/3/05), 903 So.2d 452. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment |2srecord), prior criminal record, seriousness of offense and the likelihood of rehabilitation.
 
 State v. Jones,
 
 398 So.2d 1049 (La.1981);
 
 State v. Haley,
 
 38,-258 (La.App. 2d Cir.4/22/04), 873 So.2d 747,
 
 writ denied,
 
 2004-2606 (La.6/24/05), 904 So.2d 728. There is no requirement that specific matters be given any particular weight at sentencing.
 
 State v. Shumaker,
 
 41,547 (La.App. 2d Cir.12/13/06), 945 So.2d 277,
 
 writ denied,
 
 2007-0144 (La.9/28/07), 964 So.2d 351;
 
 State v. Jones,
 
 33,111 (La.App. 2d Cir.3/1/00), 754 So.2d 392,
 
 writ denied,
 
 2000-1467 (La.2/2/01), 783 So.2d 385.
 

 Second, a sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering.
 
 State v. Smith,
 
 2001-2574 (La.1/14/03), 839 So.2d 1;
 
 State v. Dorthey,
 
 623 So.2d 1276 (La.1993);
 
 State v. Bonanno,
 
 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice.
 
 State v. Weaver,
 
 2001-0467 (La.1/15/02), 805 So.2d 166;
 
 State v. Lobato,
 
 603 So.2d 739 (La.1992);
 
 State v. Robinson,
 
 40,983 (La.App. 2d Cir.1/24/07), 948 So.2d 379;
 
 State v. Bradford,
 
 29,519 (La.App. 2d Cir.4/2/97), 691 So.2d 864.
 

 When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C. Cr. P. art. 883. Concurrent sentences arising out of a single cause of conduct are not mandatory, and it is within a | Zfltrial court’s discretion to order sentences to run consecutively rather than concurrently.
 
 State v. Johnson,
 
 42,323 (La.App. 2d Cir.8/15/07), 962 So.2d 1126;
 
 State v. Boudreaux,
 
 41,660 (La.App. 2d Cir.12/13/06), 945 So.2d 898,
 
 writ denied,
 
 2007-0058 (La.11/2/07), 966 So.2d 591;
 
 State v. Robinson,
 
 33,921 (La.App. 2d Cir.11/1/00), 770 So.2d 868.
 

 A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence or record. When consecutive sentences are imposed, the court shall state the factors considered and its reasons for the consecutive terms.
 
 State v. Johnson, supra; State v. Boudreaux, supra.
 

 Discussion
 

 The defendant’s criminal history contains no convictions but shows a variety of prior arrests whose disposition is given as “unknown” in the pre-sentence investigation report. However, the character of
 
 *541
 
 the instant offense is overwhelmingly the most important factor in the review of the defendant’s sentences.
 

 Not only did the defendant choose to end the life of Lamesha on March 9, 2006, he chose to act in a way that would cause the most harm to others in his attempt. Ms. Gibson, her parents, James and Patricia Shalala, and her 11-year-old daughter, Halle, were visitors to Louisiana on an errand to visit Ms. Gibson’s son before he was deployed overseas. By tragic happenstance, the defendant chose Ms. Gibson’s vehicle as the object he would use to complete his murderous plan. Rather than stop his car and allow Lamesha to leave, or even to complete his plan by hitting an | .^immovable object, the defendant deliberately chose to ram his car into a vehicle stopped at a stoplight. The defendant must have known that the vehicle was occupied when he made that choice, but instead of avoiding the innocent bystanders, the defendant aimed for the vehicle and accelerated. The defendant’s decision to hit Ms. Gibson’s van was the most heinous of a series of decisions that led to the deaths of three persons and the severe permanent injury of a fourth person.
 

 The trial court described the defendant as a “coward” and a “monster” who kept his own life and his health while remorselessly taking three lives and forever changing a fourth. The trial court’s reasons for these consecutive sentences are well supported by the record, and the consecutive sentences are fully appropriate.
 

 This assignment of error lacks merit.
 

 CONCLUSION
 

 The defendant’s convictions and sentences are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Ms. Anderson's first name is spelled several different ways in the appellate record. We
 
 *527
 
 use the spelling most often utilized, "Lame-sha.”
 

 [2]
 

 . Because Lamesha was so gravely injured in the subsequent crash, she has no memory of that day; the events of that morning had to be developed from other witnesses.
 

 [3]
 

 . The defendant was also indicted for second degree kidnapping of Lamesha; this charge was severed immediately prior to the instant trial.
 

 [4]
 

 . This court has applied the concept of transferred intent in other homicide cases.
 
 State v. Johnson,
 
 29,629 (La.App. 2d Cir.8/20/97), 698 So.2d 1051;
 
 State v. Jasper,
 
 28,187 (La.App. 2d Cir.6/26/96), 677 So.2d 553,
 
 writ denied,
 
 96-1897 (La.2/21/97), 688 So.2d 521;
 
 State v. Cannon,
 
 26,906 (La.App. 2d Cir.6/21/95), 658 So.2d 728.